# United States Court of Appeals
## For the First Circuit

No. 00-1837
No. 00-1910

MERRILL W. KEARNEY,

Plaintiff, Appellant,

v.

J.P. KING AUCTION COMPANY, INC.,

J. CRAIG KING,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,
and Schwarzer,* Senior District Judge.

Thomas P. Hineman and Mark K. McDonough, with whom Kevin M. Cuddy and Cuddy & Lanham were on brief for appellant.
John W. McCarthy, with whom Brent A. Singer and Rudman & Winchell, LLC were on brief for appellees.

*Of the Northern District of California, sitting by designation.

**CAMPBELL, <u>Senior Circuit Judge</u>.** This appeal from adverse rulings in the district court concerns the sale of eighty acres of undeveloped waterfront land in Lubec, Maine. Owned by plaintiff-appellant Merrill Kearney, the land was sold at auction on his behalf by defendant-appellee J.P. King Auction Company ("King Auction") on May 14, 1997.

The auction did not go well. Only two bidders were present and one withdrew when the price per acre rose to $100. The remaining bidder offered $8,000, a hugely undervalued price by both parties' estimates. (Kearney, himself, had only several months earlier purchased the land for $90,000.) Forced by the Maine Superior Court to convey the land for $8,000 to the bidder at the auction, Kearney sued King Auction alleging breach of contract, negligence, breach of fiduciary duty, negligent misrepresentation, fraudulent misrepresentation, punitive damages, negligent infliction of emotional distress, intentional infliction of emotional distress, and unfair trade practices.[1] The district court entered summary judgment in favor of King

---

[1] Suit was brought in United States District Court in the District of Maine under diversity jurisdiction as King Auction is an Alabama corporation and Kearney a citizen of Maine.

Auction on all counts but breach of fiduciary duty, negligent infliction of emotional distress and unfair trade practices. Plaintiff now appeals from that ruling, but only with respect to his claims of fraudulent and negligent misrepresentation and punitive damages. The breach of fiduciary duty claim was tried to the jury, which found for King Auction.[2] Plaintiff appeals from that result, alleging error in the trial court's exclusion of certain evidence.

We consider, first, the district court's dismissal of claims upon summary judgment, and second, the correctness of the district court's ruling excluding evidence at trial. Discerning no error, we affirm in all respects.[3]

## I.        Factual Background[4]

---

[2] Before trial, Kearney had voluntarily dismissed his claim of unfair trade practices. At trial, the district court granted King Auction's motion for judgment as a matter of law on Kearney's claim for negligent infliction of emotional distress, a determination from which no appeal has been taken.

[3] Defendants filed a cross-appeal conditioned on this court reversing in some part the judgment of the district court. As we affirm that judgment in all respects, defendants' cross-appeal is moot.

[4] The facts described below are taken from the record before the district court at summary judgment, which contained extensive deposition testimony and documentary evidence. In Part III of this opinion, when we discuss the evidentiary ruling at trial, we do so in the context of further evidence admitted during trial, which, in order to keep separate from the analysis of the evidence at summary judgment, we do not describe until Part III.

In February 1997, Kearney purchased eighty acres of undeveloped waterfront land in Lubec, Maine, for $90,000. By his own account, he had spent considerable time surveying the land before negotiating from $300,000, the original asking price, to the final sale price of $90,000. He thereupon attempted to sell the land himself for a profit, placing advertisements in various national and international newspapers such as the Wall Street Journal and the Hong Kong Daily. Shortly thereafter, Donald Long, a Canadian businessman and acquaintance of Kearney's, offered to buy the eighty acres for $1.8 million. The two men entered into an informal written agreement at the end of February 1997.[5]

Before formalization of the deal between Long and Kearney, Michael Keracher from King Auction called Kearney with an offer to evaluate the land. Keracher had seen Kearney's advertisement and thought King Auction could sell Kearney's land for him at a competitive price. During that first conversation, Kearney told Keracher that he had an offer from Long for $1.8 million, which hadn't been "completely finalized." Kearney testified that Keracher told him that "the property was just

---

[5] The deal between Long and Kearney was that Long would pay Kearney $200,000 Canadian as a down payment and would pay off the balance overtime at seven percent interest. The date of the agreement was February 28, 1997 and was to be finalized on March 8, 1997.

worth a lot more money that what [Kearney] was getting out of it . . . . He said, I will fly up right now . . . and look at it and I can give you an evaluation of what I think . . . . [I]t would be worth your while, because it isn't going to cost you anything for me to check it out . . . ." Kearney testified that he was inclined to show Keracher the land, but not before speaking with Long.

Long did not insist that the agreement between him and Kearney was binding to the extent of precluding Kearney from showing Keracher the land. Long did express his skepticism, however, with regard to Keracher's offer to sell the land for more than the $1.8 million Long had offered. Kearney testified that Long "wanted to know how anybody else could get so much money out of it, and he wanted to meet with him [Keracher]." So Keracher flew up to Maine from Alabama a few days later to visit with Kearney and Long and to see the eighty acres in Lubec.

Keracher spent no more than one hour on the property, which was covered with more than twenty inches of snow at the time. Keracher testified that he did not speak with local real estate agents or visit any other parcels of land nearby. Kearney testified that Keracher "mentioned numbers, three to ten million dollars for the property" and that "[Keracher] felt it would bring a minimum of three million dollars." Although

Kearney fell short of testifying that he understood Keracher to be guaranteeing an auction price of at least three million dollars, Kearney did say that Keracher "just said many, many times . . . I'm sure it would bring in three million dollars." When Kearney was asked "did you believe that you were being guaranteed that he would get a price like that?", Kearney responded, "I believed that he was going to get three million dollars or more out of it . . . . I felt that, sure enough, they [King Auction] were going to get me over -- if they were going to get me over 1.8 million that it would be my interest to go with them." Long testified to essentially the same statement. Long explained that although Keracher "would not guarantee it, . . . he said he would get a minimum of 3.5 [million dollars], and he thought up to ten million dollars."

After viewing the property, Kearney drove Keracher further north to Fredericton, in New Brunswick, Canada, to visit Long who was waiting for them in a Sheraton Hotel. Kearney described the meeting in the hotel room during which Long asked Keracher how King Auction "could get so much money out of th[e] property." Both Kearney and Long describe Keracher's explanation as being that King Auction drew "heavy hitters," people both Keracher and Long described as "Hollywood people" and "big movie stars . . . [who] like places like that that's

isolated." The implication was that those "heavy hitters" would bid up the price of the land. Long reiterated, however, that even though "[Keracher] was quite sure that he could get [$3-$10 million] out of it . . . it was an auction, so – you know–." Asked if Long meant that he understood there to be no guarantees, Long replied "Well, that was . . . my opinion."

Keracher denied speaking to Kearney or to Long about the dollar amount the land could bring at auction. He explained that "[w]e never do that," speaking to the King Auction policy that forbids agents from evaluating the object to be auctioned. "That is one thing that we are told by King [Auction], by our company, you never mention value. You can't." Keracher did say that he recalls telling both Long and Kearney that the land was unique because of its size and its location on the ocean. He said that he had "looked at materials, advertisements, other advertisements for land for sale in Maine, and had only been able to come across smaller parcels, five acres, three acres, two acres, ten acres. And [Kearney's land] was unique in that respect, that it was a larger parcel. It was eighty acres of what they said was ocean front property." Keracher also testified that he told Kearney that King Auction had been successful in selling "premier properties" such as his -- premier properties being defined by King Auction as worth over

a million dollars -- and that King Auction sells such properties on a regular basis. Keracher gave Kearney a list of people who had sold their property through King Auction in the past as references, encouraging Kearney to call them.

At the end of the meeting between Long, Kearney and Keracher, Long agreed to let Kearney out of their informal contract. Kearney and Keracher then drove to the Bangor, Maine airport to return Keracher to Alabama. During that drive, Kearney and Keracher discussed the details of the auction, in particular, what kind of auction it would be and who would pay the up-front costs. Keracher estimated the cost of the auction and advertising would run around $40,000. Kearney did not want to pay it all, and the two men discussed the possibility of splitting the cost. The two men also discussed the possibility of the auction being an absolute auction, an auction with a reserve, or an auction with a published reserve. Keracher described an auction with reserve as less risky because the seller "can either accept or reject the highest bid." Likewise, an auction with a published reserve announces in advance that the seller is not going to sell the property for less than a certain amount of dollars. The absolute auction as described by Keracher to Kearney "attracts the most interest because people read that its going to sell without reserve . . . and you can

expect to bring in more bidders, and because of more bidders you'll have more competition, and hopefully you'll get . . . the market value of the property." The risks of the absolute auction described by Keracher to Kearney were that the seller "take[s] what it brings . . . no matter what [King Auction] do[es], no matter how beautiful a brochure [King Auction] print[s], no matter how many ads [King Auction] place[s], at some point in time [the] property must stand on its own. It will bring what it's worth."

By plaintiff's own account, the drive to Bangor airport did not resolve the details of the auction. Both Kearney and Keracher testified that no final agreement had been reached. Not until further telephone calls and discussions regarding the above mentioned decisions, did Kearney and Keracher agree that they would split the cost of the auction and that the auction would proceed as an absolute auction rather than one with a reserve. Kearney did say that Keracher expressed his preference to proceed with an absolute auction, feeling that it would attract more bidders. To the same end, Keracher testified that Kearney "may have said . . . [that he was] not afraid of an absolute auction."[6]

---

[6] Apparently, Kearney had described to Keracher two other property auctions he had attended, one that was cancelled before it started and another that did not result in a sale. It was at

After a month and a half of sending various copies of the auction contract to each other, on April 17, 1997, Kearney signed King Auction's agreement, initialing every page. Kearney said he did not read the contract "word for word, but I looked through it." Kearney explains that he did not read the contract thoroughly because he had confidence in Keracher – "I had a hundred percent trust in him . . . [he] was a professional, and he was an expert in what he was doing."

The contract specifies the duties of King Auction, such as to "prepare and distribute advertising and sales literature in a manner reasonably calculated to advise persons who might be interested in the PROPERTY and the sale thereof" and to "prepare a full-color, descriptive sales brochure with photographs of the property." The contract also contains a disclaimer that the seller, Kearney,

> acknowledges and understands that neither KING nor any of its agents, employees, or representatives have guaranteed or promised that the PROPERTY, in whole or in part, shall produce a specific price or that a certain minimum price will be bid at the AUCTION. SELLER is not relying on KING for advice on the following: legal; accounting; taxes; or the laws, rules or regulations of any government. This AGREEMENT contains the entire understanding of the parties, and all prior understandings and negotiations have been merged herein. SELLER is not relying

the latter auction where he learned of the property at issue.

upon any statements or representations made by or on behalf of KING that are not specifically set forth in this AGREEMENT.

In fulfillment of its duties, King Auction then advertised the auction in nation-wide newspapers and magazines, prepared full-color brochures, and mailed several thousand brochures to people on their mailing list. Keracher's undisputed deposition testimony was that approximately 130 people responded to the advertisements requesting brochures and fifty people responded after receiving those brochures. Of those, between eight and twelve people paid twenty-five dollars each to receive full property information packages. None, however, showed up at the auction.

Only two people attended the auction to bid on the property. At this point, Keracher alleges that he asked Kearney if he wanted to continue with the auction and Kearney said yes. Kearney contends to the contrary, testifying that it was he who wanted to stop the auction but Keracher would not listen and proceeded anyway. Kearney claims that at that point he felt that King Auction failed to successfully advertise to attract bidders. He said that he also felt that King Auction failed to honor his wishes as his agent to stop the auction when only two bidders showed up. When the auction started and one bidder dropped out after the price per acre rose to $100, the

auctioneer attempted to change the auction from absolute to reserve. This attempt failed. The first bidder, successfully bidding $8,000 for the property, sued Kearney in Maine Superior Court winning a judgment that ordered Kearney to convey the land.

This lawsuit by Kearney against King Auction followed. All other claims being disposed of prior to trial, the jury decided only Kearney's claim against King Auction for breach of fiduciary duty. It found no such breach, apparently believing that King Auction, despite holding the auction when only two bidders were present, nevertheless fulfilled its fiduciary duty to Kearney. Judgment was entered for King Auction.

## II. Motion for Summary Judgment

### A. Misrepresentation Claims

Kearney's misrepresentation claims were premised on Keracher's statements to him that (1) at auction Kearney's eighty acres in Lubec would sell for between $3 and $10 million, and (2) the auction would attract "heavy hitters."[7] The

---

[7] Although Keracher disputes that he ever made these precise statements, for purposes of summary judgment, we take the record in the light most favorable to the Kearney, the non-moving party. New York State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n, 198 F.3d 1,3 (1st Cir. 1999). Kearney's testimony, along with Long's, allow us to comfortably conclude for summary judgment purposes that a fact finder could find that these statements were made as both of these men say they were.

-12-

defendants contend that these statements, assuming they were made, are not actionable under Maine common law as they are not statements of present fact but expressions about belief about and hope for the future. Defendants further contend that the record at summary judgment fails to create a jury question as to Kearney's justifiable reliance on these statements to support either cause of action.[8] Determining, as we do, that defendants are correct with regard to their first contention – that, as a matter of Maine law, neither statements are of present fact, hence, not actionable under Maine law as misrepresentations – we affirm the district court's judgment.[9]

---

[8] Claims for fraudulent and negligent misrepresentation, although obviously distinct, both require that the defendant have made a false representation of present fact and that the plaintiff justifiably relied on the representation as true. As claims for fraudulent and negligent misrepresentation share these two elements, we do not distinguish the two for purposes of this appeal. We note, too, that the plaintiff in his brief collapsed his analysis of the two misrepresentation claims for the same reason. For the elements of fraudulent misrepresentation, see, e.g. Glynn v. Atlantic Seaboard Corp., 728 A.2d 117, 119 (Me. 1999)(citing Letellier v. Small, 400 A.2d 371, 376 (Me. 1979)). For the elements of negligent misrepresentation, see, e.g., Bowers v. Allied Inv. Corp., 822 F.Supp. 835, 839 (D. Me. 1993) (citing Diversified Foods, Inc. v. First Nat'l Bank of Boston, 605 A.2d 609, 615 (Me. 1992)).

[9] Plaintiff contends that we are barred from deciding this appeal on this ground because King failed to raise this argument below. The record at the district court shows, however, that this argument was before the trial court and that it was at least one basis of its ruling granting King's motion for summary judgment.
With respect to the fraud claim, the district court ruled

Last year, in <u>Vielleux</u> v. <u>Nat'l Broadcasting Co.</u>, 206 F.3d 92 (1st Cir. 2000), this court considered the evolving Maine common law of misrepresentation when the basis of the claim is a statement that might be construed as an opinion or promise of future performance.

> Traditionally, an action for deceit could be brought under Maine law only if the challenged misrepresentation was of past or existing fact, not just of opinion or of promises for future performance. <u>See</u> <u>Wildes</u>

that Kearney failed to proffer sufficient evidence from which a reasonable jury could find that King Auction recklessly disregarded the truth of the above statements. The district court said that although King Auction was wrong, "being wrong does not make its statements intentional misrepresentations. ... Additionally, it is dubious whether Kearney could justifiably rely on King's representations. <u>See</u> <u>generally</u> <u>Eaton</u> v. <u>Sontag</u>, 387 A.2d 33, 37-9 (Me. 1978)("dealer's talk")." <u>Kearney</u> v. <u>J.P. King Auction Co., Inc.</u>, No. 99-137-B, 2000 WL 761793, at *3 (D. Me. 2000, March 2, 2000)(some citations omitted). With respect to the negligence claim, the district court concluded that there was no evidence from which a reasonable jury could find that "the information supplied was false or that Kearney could reasonably rely upon it." <u>Id.</u> Both of these rulings were in response to substantially the same arguments raised on appeal by King: that (1) the statements are nonactionable statements of opinion and (2) Kearney could not justifiably rely on either statement.

Moreover, an appellate court is not constrained to affirm on the grounds relied upon below. <u>See</u> <u>Mesnick</u> v. <u>General Electric Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) ("Since appellate review of a grant of summary judgment is plenary, the court of appeals, like the district court, must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor . . . . An appellate panel is not restricted to the district court's reasoning but can affirm a summary judgment on any independently sufficient ground.")(citations and quotation marks omitted).

-14-

v. _Pens Unlimited Co._, 389 A.2d 837, 840 (Me. 1978). Even "a preconceived intention not to perform" was said to be incapable of turning a breach of a promise . . . to do something in the future into an action for deceit. _Shine_ v. _Dodge_, 130 Me. 440, 157 A. 318, 319 (Me. 1931).

In the _Wildes_ case, however, the Maine Supreme Judicial Court pointed to a sentence in _Shine_, _supra_, as broadening the blanket rule. Allowing a finding of deceit to be based on a disingenuous promise of employment, the _Wildes_ court quoted _Shine_: "The relationship of the parties or the opportunity afforded for investigation and the reliance . . . may transform into an averment of fact that which under ordinary circumstances would be merely an expression of opinion." 389 A.2d at 840 (quoting _Shine_, 157 A. at 318).

_Vielleux_, 206 F.3d at 119-20. This court's conclusion in _Vielleux_ was that "in appropriate circumstances, promises concerning future performance may be sufficiently akin to averments of fact as to be actionable under Maine misrepresentation law." _Id._ As the two statements at issue are both statements about the hoped-for outcome of the auction, _i.e._, a future event at which Keracher arguably promised "heavy hitters" would be present and that the land would sell for between $3 and $10 million, the question is whether this case presents the "appropriate circumstance[]" in which Keracher's "promises concerning [the outcome of the auction] may be sufficiently akin to averments of fact as to be actionable under Maine law," _id._ In other words, we must decide whether the

-15-

interaction between Kearney and Keracher was such that Kearney "justifiably understood [Keracher's promises of future performance] as being of fact and not mere opinion." Wildes, 389 A.2d at 840.

The Maine cases in which statements of opinion "have been justifiably understood as being of fact" have arisen under circumstances in which the plaintiff is "at the mercy of the defendant," such as in employment situations where an employer, with full knowledge of imminent corporate downsizing, nevertheless promises a position to a new salesperson. Id. at 840-41. See also Boivin v. Jones & Vining, Inc., 578 A.2d 187, 188-89 (Me. 1990) (upholding a jury verdict in favor of plaintiff-employee for misrepresentation claim the basis of which was defendant-employer's promise of continued employment made with knowledge that such continued employment was likely unfeasible). We drew upon this reasoning in Veilleux as support for upholding (in relevant part) a jury verdict in favor of plaintiffs' claim for a misrepresentation where the plaintiffs were not employees suing their employer over promises of further employment, but, when the statements were made, were in a similarly vulnerable position.

In Veilleux, the defendants were truck drivers who were being featured in a television news program and were promised by

-16-

the defendant news station that, among other things, an organization antagonistic to their profession (Parents Against Tired Truckers (PATT)), would not be included in the program. One factor influencing this court's conclusion that the jury could reasonably construe that promise as an averment of present fact was that the news station's statements concerned "aspects of the program within [its] exclusive control [and] upon which [plaintiff] reasonably could have relied." Veilleux, 206 F.3d at 120. We went on to explain that "[the plaintiff] was not in a position to know about, investigate or influence defendant's inclusion of PATT in the program; he was 'at the mercy of the defendant[s]' with regard to their representations." Id. (citing Wildes, 389 A.2d at 840) (citations omitted). Equally important, however, to this court's conclusion in Veilleux that the relevant statement was an actionable misrepresentation more closely akin to an averment of present fact than of future performance was that at the time the statement was made,

> a jury could reasonably find . . . that the defendants deliberately concealed from [one plaintiff], at the time they told him that PATT would not be included, the fact that they had already filmed and recorded taped comments highly critical of truckers from PATT's co-founders . . . in preparation for use in the projected program . . . . The program was therefore already a work in progress when the misrepresentation was made. A promise not to include PATT and the concealment of prior PATT filming can be

-17-

> regarded under the rational of <u>Wildes</u> and
> <u>Boivin</u> as pertaining to existing "facts"
> rather than mere opinions or projections.
> Accordingly, we do not think the fact that
> defendants' alleged representation to
> exclude PATT also pertained to a time in the
> future (<u>i.e.</u>, when the completed program
> would be aired) prevents it from being
> actionable as a misrepresentation of fact
> under recent Maine law.

<u>Veilleux</u>, 206 F.3d at 120-21.

None of the factors present in <u>Veilleux</u> -- a defendant's exclusive control over and deliberate concealment of critical information -- which factors track those considered and relied upon by Maine courts, are present in this case. With regard to the first statement about the market value of land to be garnered at auction, the relationship between Kearney and King Auction was not vulnerable or one-sided such that Kearney could not undertake his own investigation into the market value of his property or the range of values of land sold by King at auction. On the contrary, the evidence was undisputed that Keracher encouraged Kearney to inquire into King Auction's references, those presumably being individuals on behalf of whom King Auction sold premier properties and individuals who purchased such properties at auctions organized by King Auction. Moreover, Kearney had been to a couple of auctions himself and had experience with evaluating, buying and selling land in Maine. He, as much as King Auction, should have been able to

-18-

investigate whether or not the $3 to $10 million figure was a reasonable one for the price of waterfront land in Lubec, Maine. Nor was there any evidence that Keracher was deliberately concealing something from Kearney that would make Keracher's estimate of $3 to $10 million more like an averment of present fact than of future aspirations. This statement is in stark contrast to the one at issue in <u>Veilleux</u> where the promise not to include the PATT footage was made after that footage had already been filmed.

As for the second statement about "heavy hitters", there is little evidence in the record tending to establish that Keracher was lying when he said that King Auction's auctions attract "heavy hitters." Whereas plaintiff provided no evidence that those "heavy hitters" did not exist or did not attend other King Auction auctions, it is undisputed that King Auction provided plaintiff a list of references of former clients and attendees, the relative wealth of which plaintiff could have investigated to assure himself of the truth of Keracher's "heavy hitters" statement. For ought that appears, King Auction's other auctions had attracted "heavy hitters" however unsuccessful the later situation in Kearney's case. To be sure, the fact that Kearney's own auction played to a total absence of the so-called "heavy hitters" may be some evidence of the

falsity of King Auction's statement that its auctions drew "heavy hitters." Standing alone, however, it is not enough to create a jury question on the issue of misrepresentation.

Moreover, it is important to note that in stating that King Auction's auctions attract "heavy hitters," Keracher did not guarantee Kearney that those "heavy hitters" would show up at his auction. A reasonable interpretation of the statement, especially in light of the auction contract both parties signed (e.g., defining King Auction's duty, in part, to "prepare and distribute advertising and sales literature in a manner reasonably calculated to advise persons who might be interested in the PROPERTY and the sale thereof"), is that King Auction's client list and reputation was such that its auctions could attract wealthy bidders who are prepared to pay a high price for premier properties. It should have been obvious, however, from the signed auction contract negotiated by both parties and the nature of voluntary auctions themselves, that King Auction had no real control over who chose to attend any of its auctions, aside from doing its best to publicize the event and market the property, duties which Kearney failed to show that King Auction did not fulfill. On the contrary, the undisputed evidence demonstrated that King Auction prepared and placed nation-wide advertisements, printed and sent to individuals on its mailing

list brochures describing the property, followed up with those individuals requesting further information with full-color brochures.[10]   Plaintiff's only counter-evidence was his own deposition testimony in which he states, without foundation, that he felt that King Auction failed to successfully attract bidders.  This self-serving and conclusory statement of opinion has no probative value as to the truth of Keracher's statement that King Auction's auctions attract "heavy hitters", the question a jury was to have decided had the misrepresentation claim survived.

In any event, both statements at issue here are akin to those in this court's decision in Schott Motorcycle Supply, Inc. v. American Honda Motor Co., 976 F.2d 58 (1st Cir. 1992) – statements found to be nonactionable misrepresentations under Maine law.  In Schott, plaintiff, a motorcycle dealership, was allegedly promised by the defendant, American Honda Motor Company, that Honda Motor Company would remain just as committed to the motorcycle industry as it had in the past and that new Honda products and programs would cause an increase in Honda sales.  Allegedly relying on these assurances, plaintiff split into two businesses, one exclusively selling Honda motorcycles,

---

[10] That King Auction would retain a percentage of the price of the sale also suggested that it would have been against its interest not to try to market the auction as best it could.

-21-

and the other selling Harley Davidsons and golf carts. Within three years, the business that was solely devoted to Honda motorcycles went under, due in whole part, contended the plaintiff, to the defendant's false assurances of continued product development and commitment. This court, citing Boivin and Shine, supra, affirmed the district court's dismissal of plaintiff's fraud claim that was based on the above statements because the "alleged misrepresentations consisted only of opinions as to future events . . . . These general statements in the context of the franchisor-franchisee communications constitute nothing more than 'puffing' or 'trade talk,' upon which no reasonable person would rely." Schott, 976 F.2d at 65 (citations omitted).

Like the statements in Schott, the statements at issue here are no more than averments of the defendants' high expectations for the auction King Auction was to oversee. Indeed, the district court, in ruling for the defendants on this issue, cited to Sontag v. Eaton, 387 A.2d 33 (Me. 1978), a case that merely reaffirms what is black letter law in Maine: that a statement made by a seller of land regarding its estimated value is "dealer's talk" and cannot be actionable fraud should the market price of the land be in actuality much lower. See id. at 37 ("[M]isrepresentations as to value and quality of land

-22-

made by the vendor, even though made with fraudulent intent, are not actionable . . . . Such representations are 'dealer's talk.'"). Although King Auction was not the owner of the land to be sold, King Auction was "selling" the benefits of its services on the basis of the perceived quality of Kearney's land and its expertise in the auction process. As a businessman who sells land at auction, Keracher's statements regarding the potential "heavy hitters" at auction and the land's hoped-for sale price of $3 to $10 million

> should have been understood [by Kearney] to be[] but the use of extravagant language of the class known to every man of ordinary experience as "dealer's talk," i.e., "that picturesque and laudatory style affected by nearly every trader in setting forth the attractive qualities of the goods he offers for sale," and this even among friends. But such is not actionable. The law recognizes the fact that sellers may naturally overstate the value and quality of the articles of property which they have to sell. Everybody knows this, and a buyer has no right to rely on such statements.

Id. at 37-38 (citations omitted). See also id. at 38 (stating that "[s]ince an express statement by the Eatons that their property was worth eighty thousand ($80,000) dollars, the selling price, . . . would not be actionable fraud, but merely an opinion of the sellers which the buyers must expect to be likely inflated as puffing or dealer's talk, their failure to disclose the alleged fact, if true, that the actual investments

-23-

in the property did not reflect the true value of the property would also not be actionable fraud").

We conclude, therefore, that no action for misrepresentation lies under Maine law under these circumstances. Summary judgment for the defendants on counts four (negligent misrepresentation) and five (fraudulent misrepresentation) was properly granted.

### B. Punitive Damages

As plaintiff had no viable misrepresentation claim, <u>supra</u>, his claim for punitive damages for those alleged misrepresentations also fails.[11]

## III. Evidentiary Ruling at Trial

During trial on plaintiff's remaining claim for breach of fiduciary duty, plaintiff asked to introduce evidence of the two statements that were the basis of his previously dismissed misrepresentation claims. The trial court, questioning the relevance of the statements to the claim the jury had to decide

---

[11] In any case, the evidence before the district court at the time of its summary judgment ruling fails to meet Maine's malice standard for punitive damages. "Maine law requires a plaintiff to prove by clear and convincing evidence that the defendant was motived by 'ill will' toward the plaintiff, or acted so 'outrageously' that malice could be inferred." <u>Veilleux</u>, 206 F.3d at 135 (citing <u>Tuttle</u> v. <u>Raymond</u>, 494 A.2d 1353, 1361 (Me. 1985)). <u>See also</u> <u>Boivin</u> (reversing a jury verdict for punitive damages despite upholding the jury finding for fraud based on false assurances of future employment).

(breach of fiduciary duty), ordered arguments and proffers on the relevance issue for the following morning before the jury was to be brought in.

Plaintiff's position was that the statements were relevant to the breach of fiduciary duty claim because they were made during the scope of the agency relationship and, as he contended they were false or misleading, they bore on the issue of whether Keracher breached his fiduciary duty to Kearney.[12] Defendants' position was that the statements were not relevant because they could not have been made during the agency relationship as they were undisputably made on the first day Kearney and Keracher met and therefore before any fiduciary duty arose.[13] When the court pressed the plaintiff to substantiate his position that the agency relationship between Kearney and

---

[12] Presumably, plaintiff relies here on a fiduciary's duty of good faith and, in some instances, material disclosure. <u>See</u>, e.g., <u>Glynn</u> v. <u>Atlantic Seaboard Corp.</u>, 728 A.2d 117 (Me. 1999)(in case alleging, among other things, corporate fraud among officers, stating that "[w]here a fiduciary relationship exists between the parties, omission by silence may constitute the supplying of false information")(quotation marks omitted); <u>Estate of Whitlock</u>, 615 A.2d 1173, 1178 (Me. 1992)(in a case alleging fraud on the part of a trustee of an estate, stating "[t]h[e] duty to make full disclosure and otherwise to exhibit extreme good faith runs through the whole law of fiduciary and confidential relations ...")(citing George G. Bogert, <u>Trusts and Trustees</u> § 544, at 407-08 (2d ed. 1978)).

[13] This position was in addition to defendants' assertion that the statements, assuming they were made, were not false or misleading.

King Auction began on the very first day Kearney met Keracher, plaintiff explained "that [a] fiduciary relationship is not a lightning bolt.  It's more analogous to a web that's being woven.  And the web began when these gentlemen met and continued and was reenforced and developed until it matured on May 14 [the date of the auction].  That is our position."

The court continued to be perplexed by plaintiff's position regarding the statements' relevancy, and asked the plaintiff directly:  "when is the first manifestation of agreement between King [Auction] and Kearney that there will be an auction and a relationship?"  To this, plaintiff's counsel responded:  "I would represent to you that in . . . the car as Mr. Kearney drives back from Fredericton to Bangor to drop Mr. Keracher off at the airport, he will indicate to you that at that time he had decided that it was — the property was going to be auctioned and he and Mr. Keracher discussed the methodology of the auction . . . .  That's why the conversations progressed that far, because there had been an agreement in the course of that car ride . . . ."  Having heard this apparent concession from plaintiff's counsel that the earliest the agency relationship began was on the way from Canada to the Maine airport, the court then asked counsel when the statements were made, to which he responded "A very precise question, and I have

to give you a precise answer. We're at the other end of the car ride. They're before you get to Bangor. They are part of what leads up to coming down to Bangor."

Having received this apparent concession that the statements at issue were made before an agency relationship between Kearney and King Auction had formed, the district court ruled the statements irrelevant and inadmissible, stating that "the fiduciary obligation flows from the agency relationship. That is not established until there is an agreement, whether it be written or oral. I understand what [plaintiff's counsel] is proposing. But these are matters that go to the inducement, the entering into the [agency] agreement. They have already been ruled upon in the summary judgment context. The questions before the jury will be breach of the fiduciary obligations that flow from the auction agency relationship." In essence, the court concluded that without an agency relationship to create a fiduciary duty at the time the statements were made, the statements were not relevant to any breach of that duty. Because we can find no error, let alone reversible error, in this reasoning, we affirm the district court's exclusionary ruling.

Implicit in the district court's exclusionary ruling was the court's acceptance of the factual predicate that the

agency relationship between the parties had not commenced until after the statements were made.[14] This factual predicate is not only supported by plaintiff's counsel's concession at trial, it is independently supported elsewhere in the record. Viewed as a factual finding, it was not clearly erroneous.[15] Kearney's and Long's deposition testimony indicated that the statements regarding the estimated value of land and King Auction's "heavy hitters" were made just after Keracher had viewed the property and once again during the meeting with Mr. Long. This coincides with plaintiff's concession at trial that the statements were made before Keracher returned to Bangor to fly home, before, as plaintiff also concedes, any fiduciary relationship was manifested between the parties. It was, therefore, manifestly reasonable for the district court to find that the statements

---

[14] The parties devoted considerable time in the district court arguing about when precisely the fiduciary duty between Kearney and King Auction arose. King Auction argued that the fiduciary relationship began only with the signing of the agency contract. Plaintiff argued that the fiduciary relationship began much earlier, sometime in the car ride back to Bangor. The district court did not resolve the dispute, and neither do we, because even if the relationship began during the ride back to Bangor, the statements sought to be admitted into evidence were made before that relationship arose.

[15] We review preliminary findings of fact that form the basis of evidentiary rulings for clear error. Baker v. Dalkon Sheild Claimants Trust, 156 F.3d 248, 252 (1st Cir. 1998)

-28-

were made prior to the beginning of the parties' fiduciary relationship.

This being so, the only remaining question is whether these statements were nonetheless relevant to the breach of fiduciary duty claim even though made before the fiduciary relationship began. In ruling they were not relevant, the district court said: "[T]hese are matters that go to the inducement . . . [and] [t]hey have already been ruled upon in the summary judgment context." In effect, the district court concluded that plaintiff was impermissibly seeking to revive his misrepresentation claims, claims that the district court previously (and, as we have already concluded, correctly) dismissed. Plaintiff made no argument in the district court to refute the court's conclusion along these lines, e.g., that these statements were relevant, if at all, only to the dismissed misrepresentation claims and not to the fiduciary duty claim. We discern no abuse of discretion in this ruling. Iacobucci v. Boulter, 193 F.3d 14, 20 (1st Cir. 1999) (standard of review).[16]

---

[16] In any case, an erroneous evidentiary ruling requires vacation of a jury verdict (the remedy sought here) only if the ruling excludes evidence and "the exclusion results in actual prejudice because it had a substantial and injurious effect or influence in determining the jury's verdict." United States v. Shay, 57 F.3d 126, 134 (1st Cir. 1995) (internal quotation marks omitted). Neither party has argued, one way or the other, that the ruling had such a "substantial or injurious effect" on the jury verdict. We eschew any such argument on their behalf.

Plaintiff raises for the first time on appeal a legal theory as to why the statements could be relevant to the fiduciary duty claim. He contends that even if the statements were not actionable misrepresentations when made, once a fiduciary duty was established and King Auction had reason to know that Kearney was laboring under the misconception that his land would fetch $3 to $10 million at auction, King Auction had a duty as Kearney's agent to correct Kearney's mislaid high-hopes. Plaintiff bases this argument on the proposition that, as his fiduciary, King Auction (via Keracher) is obligated to fully disclose "all facts within [its] knowledge which bear materially upon [Kearney's] interests." Goldberg Realty Group v. Weinstein, 669 A.2d 187, 190 (Me. 1996) (citing Jensen v. Snow, 131 A. 415, 418 (1933)). This rule commonly arises in Maine law with regard to the sale of land by a seller's agent.

> The rule is premised on the fact that a real estate agent is not hired simply to locate a buyer, but to so do as the seller's fiduciary. . . . There is no requirement that the principal prove fraud or malice on the part of the agent or that the principal show actual harm caused by breach of the agent's duty. In a case alleging nondisclosure, . . . the only questions are whether the information was material and whether it was withheld by the fiduciary. The rule encourages fiduciaries to avoid temptation altogether by forcing full and frank disclosures.

-30-

Id. (quotation marks omitted).[17]

Plaintiff can secure no benefit from this Maine common law rule. Because the appellant never raised this theory of relevance in the district court, he is precluded from presenting it for the first time on appeal. See McCoy v. Massachusetts Institute of Technology, 950 F.2d 13, 22 (1st Cir. 1991). See also Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988) (stating that a party has a duty "to spell out its arguments squarely and distinctly . . . [rather than being] allowed to defeat ths system by seeding the record with mysterious references . . . hoping to set the stage for an ambush should the ensuing ruling fail to suit"). This sound rule of waiver protects district courts from having to second-guess and read between the lines of the briefing presented to it by opposing parties. As we have said, "[o]verburdened trial judges cannot

---

[17] Although we affirm the jury verdict for King Auction, we note that under Maine law the only apparent remedy for breach of fiduciary duty in this context would appear to be the return of the broker's commission, here some small percentage of the $8,000 for which the land sold. See Goldberg Realty Group, 669 A.2d at 190 (reaffirming previous holding "that the broker forfeits any right to a commission if he breaches [fiduciary] duty" of material disclosure).

be expected to be mind readers."  <u>Id.</u>[18]  Plaintiff's waiver ends

the matter.[19]

---

[18] Plaintiff confuses this waiver principle with the rule allowing the court of appeals to affirm a district court's granting of summary judgment on a different basis than that relied on below.  The former prevents an appellant from overturning the district court on the basis of an argument never presented to the district court, furthering considerations of judicial economy and basic fairness; the latter furthers the same goals and reaffirms the long-standing Supreme Court precedent that "[w]here the decision below is correct[,] it must be affirmed by the appellate court though the lower tribunal gave a wrong reason for its action." <u>Riley Co.</u> v. <u>Commissioner</u>, 311 U.S. 55, 59 (1940)(citing <u>Helvering</u> v. <u>Gowran</u>, 302 U.S. 238, 245 (1937)("In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.")).  <u>See</u> <u>also</u> <u>Mesnick</u>, 950 F.2d at 822 ("An appellate panel is not restricted to the district court's reasoning but can affirm a summary judgment on any independently sufficient ground."); <u>Chongris</u> v. <u>Board of Appeals</u>, 811 F.2d 36, 37 n. 1 (1st Cir. 1987)(citing "ample precedent [in this circuit] for this sort of fluctuation").

[19] We note, however, without deciding the issue, that even if there was no waiver here, it is by no means certain that plaintiff would prevail were we to reach the merits of his relevancy argument.  For one thing, it is not clear that the Maine common law rule on which plaintiff relies applies equally in the present context as it does in the seller-real estate agent context.  For another thing, the statements' relevance depends upon a strained interpretation of Keracher's deposition testimony in which he says "I told Mr. Kearney, and would tell him again, especially as we got nearer to the auction, if he wanted to sell this property to anyone for $1.8 million, I would say do it, because ... our company would be paid a commission."  Far from suggesting (as plaintiff urges it does) that Keracher had failed to accurately apprise Kearney of material information regarding the potential sale price of his land, this statement tends to suggest that Keracher, in performing his fiduciary duty, strove to counsel Kearney in such as way as to comport with Kearney's wishes and interests.  Finally, as we stated, <u>supra</u> note 16, even assuming the district court erred in

Finding no error in the district court's exclusionary ruling, the verdict is therefore **affirmed**.  Defendants' conditional cross-appeal is **dismissed** as moot.

---

excluding the statements as irrelevant, plaintiff is faced with the further hurdle of showing that excluding the evidence resulted in "actual prejudice because it had a substantial and injurious effect or influence in determining the jury's verdict."  Shay, 57 F.3d at 134 (internal quotation marks omitted).  Plaintiff has failed to argue for, let alone make, a showing of actual prejudice.