UNCLE HENRY'S INC., Plaintiff

v.

PLAUT CONSULTING
INC., Defendant.

No. Civ. 01–180–B–H.

United States District Court,
D. Maine.

Jan. 9, 2003.

Stephen C. Whiting, Whiting Law Firm, P.A., Portland, ME, Edward P. Watt, Watt & Associates, Austin, TX, for Plaintiff.

James G. Goggin, Seth W. Brewster, Peter S. Black, Verrill & Dana, Portland, ME, Kate S. Debevoise, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, John P. Dennis, Dale C. Kerester, Lynch, Brewer, Hoffman & Sands, Boston, MA, for Defendant.

Gerald F. Petruccelli, Petruccelli, Martin & Haddow, LLP, Portland, ME, for Movant.

## ORDER AFFIRMING RECOMMENDED AND MEMORANDUM DECISIONS AND ORDERS OF THE MAGISTRATE JUDGE

HORNBY, District Judge.

### I. MOTIONS TO STRIKE AND MOTION FOR SUMMARY JUDGMENT

The United States Magistrate Judge filed with the court on October 21, 2002, with copies to counsel, his Memorandum Decision on Parties' Motion to Strike and Recommended Decision on Defendant's Motion for Summary Judgment. The plaintiff filed an objection to the Recommended Decision on November 8, 2002, its motion for reconsideration of the recommendations on November 14, 2002, and its amended motion for leave to file supplemental appendix and supplemental statement of facts on November 14, 2002. The Magistrate Judge issued his Memorandum Decision on Plaintiff's Motions for Reconsideration and for Supplementation of the Record on December 17, 2002.

I agree with the Magistrate Judge's decision denying the plaintiff leave to file supplemental appendix and supplemental statement of facts so far as the motion to reconsider directed to him is considered; and, after *de novo* review, I adopt the Magistrate Judge's decision as my own in determining the record for purposes of my review of the objections to his Recommended Decision. Under the clearly erroneous review standard, I AFFIRM his rulings on the motions to strike. Upon *de novo* review, I AFFIRM the Magistrate Judge's Recommended Decision on the Motion for Summary Judgment as amended by the Magistrate Judge's Memorandum Decision on motions for reconsideration as follows:

1. The plaintiff's motions to strike are GRANTED IN PART and DENIED IN PART.

2. The defendant's motion to strike is GRANTED.

3. The defendant's motion for summary judgment is:

(i) GRANTED with respect to Counts I and VI of the Amended Complaint and Plaut's Eighth Affirmative Defense;

(ii) GRANTED with respect to Counts III and IV as to all claims, except for that pertaining to Statement No. 1;

(iii) GRANTED with respect to Count V, except as it pertains to the period from July 18, 2001 through August 23, 2001; and

(iv) otherwise DENIED.

As to all Counts of the Amended Complaint that survive summary judgment, the Court DECLARES and ADJUDGES that:

1. Plaut shall in no event be liable to Uncle Henry's except for actual damages;

2. Plaut shall in no event be liable for damages in an amount in excess of the full amounts paid or payable under the statement of work ("SOW") (*i.e.*, $645,100), plus reasonable attorney fees up to twenty percent of the amount reflected in the SOW (*i.e.*, $129,020); and

3. Plaut shall in no event be liable to Uncle Henry's for consequential, incidental, special or indirect damages (including loss of profits or business opportunities), damages for loss of or damage to recorded data, or damages suffered by third parties.

The following remain for trial (in addition to Plaut's counterclaims, as to which no dispositive motion was filed):

(i) Count II of the Amended Complaint;

(ii) To the extent they bear on Statement No. 1 only, Counts III and IV of the Amended Complaint; and

(iii) To the extent it pertains to the period from July 18, 2001 through August 23, 2001, Count V of the Amended Complaint.

## II. DEFENDANT'S MOTION TO AMEND

The Magistrate Judge issued his Recommended Decision on Defendant's Motion to Amend on October 21, 2002. The time within which to file objections expired on November 7, 2002, and no objections have been filed. The Magistrate Judge notified the parties that failure to object would waive their right to *de novo* review and appeal.

It is therefore ORDERED that the Recommended Decision of the Magistrate Judge is hereby ADOPTED. The defendant's motion to amend paragraph 43 of its Answer is GRANTED. The defendant is directed to file and serve forthwith an Amended Answer and Counterclaim limited to an amendment of paragraph 43 of the Answer, as proposed in its motion.

1. The Complaint names as defendants Plaut Consulting Inc. ("Plaut") and EdgeWing, a division of Plaut. However, as Plaut points out, technically there is only one defendant inasmuch as EdgeWing was an internal, unincorporated subdivision of Plaut. *See* Defendant's Motion for Summary Judgment, etc. ("Defendant's SJ Motion") (Docket No. 35) at

## III. DEFENDANT'S MOTION TO EXCLUDE TESTIMONY

No response has been filed to defendant's Motion to File Additional Memorandum and Incorporated Memorandum in Support of Motion to Exclude Testimony of Plaintiff's Expert Raymond Neveau. The motion is GRANTED.

Ruling on the defendant's motion to exclude testimony is RESERVED. It is ORDERED that at the final pretrial conference, counsel shall inform the Court which experts remain in controversy following these summary judgment rulings and any further discussion between counsel.

So ORDERED.

*UNCLE HENRY'S INC., Plaintiff*

*v.*

*PLAUT CONSULTING INC., Defendant*[1]

## *MEMORANDUM DECISION ON PARTIES' MOTIONS TO STRIKE AND RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

DAVID M. COHEN, United States Magistrate Judge.

Defendant Plaut moves for summary judgment as to Counts I and III–VI of plaintiff Uncle Henry's Inc.'s ("Uncle Henry's") amended complaint and as to its own eighth affirmative defense, and partial summary judgment as to any remaining counts of Uncle Henry's complaint, in this

1 n. 1; Statement of Undisputed Material Facts ("Defendant's SMF") (Docket No. 36) ¶ 9; Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Plaintiff's Opposing SMF") (Docket No. 49) ¶ 9. Therefore, I will follow Plaut's convention of referring to itself as "Plaut" or as the "defendant," singular.

diversity action arising from a failed attempt to redesign Uncle Henry's web site. Defendant's SJ Motion at 1; Plaintiff's First Amended Complaint ("Complaint") (Docket No. 10); Answer and Counterclaims ("Answer/Counterclaims") (Docket No. 12) at 16. Incident thereto, each party moves to strike portions of the other's evidence and/or statements of material fact. Plaintiff's Objections to Defendants' Summary Judgment Evidence ("Plaintiff's First Motion To Strike") (Docket No. 40); Defendant's Motion To Strike Statement Nos. 60–65 of Plaintiff's Genuine Issues of Material Fact ("Defendant's Motion To Strike") (Docket No. 61); Plaintiff's Objections to Defendant's New Evidence: Tabs 43–67 ("Plaintiff's Second Motion To Strike") (Docket No. 66). For the reasons that follow, I grant in part and deny in part the plaintiff's motions to strike, grant the defendant's motion to strike and recommend that the defendant's motion for summary judgment be granted in part and denied in part.

## I. Summary Judgment Standards

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir.2001)

(quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir.2000). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

## II. Factual Context

### A. Motions To Strike

As a preliminary matter, before sketching the contours of the facts cognizable on summary judgment, I address the parties' motions to strike.

#### 1. Plaintiff's First Motion To Strike (Docket No. 40)

I rule as follows on the Plaintiff's First Motion To Strike: [2]

---

**2.** Plaut posits that a number of Uncle Henry's objections are mooted by admissions made in Uncle Henry's responsive statement of material facts. *See generally* Defendants' [sic] Opposition to Plaintiff's Objections to Summary

Judgment Evidence (Docket No. 59). Were this the case, Uncle Henry's objections would have been nothing more than an empty exercise. Uncle Henry's admissions most sensibly are read as contingent responses to be consid-

1. Objection to a pleading found at Tab 3 of the defendant's appendix of documents on the ground that pleadings are not proper summary judgment evidence, *see* Plaintiff's First Motion To Strike ¶ 1; *see also* Answer/Counterclaims, Tab 3 to Appendix of Documents in Support of Statement of Undisputed Material Facts ("Defendant's First Appendix"), filed with Defendant's SMF: *Overruled.* While an unverified pleading, standing alone, is not proper summary judgment evidence, Plaut pairs its citations to Tab 3 with citations to Tab 4, in which Uncle Henry's admits the relevant allegations in its responsive pleading. *See* Defendant's SMF ¶¶ 7, 106–08. This is in the nature of an admission, which is proper summary judgment evidence per Fed.R.Civ.P. 56(c).

■ 2. Objection to the entirety of a declaration of William O'Brien found at Tab 5, and to specific paragraphs contained therein, on grounds, *inter alia*, that the declaration does not state that O'Brien is competent to testify and is not shown to be made on personal knowledge, *see* Plaintiff's First Motion To Strike ¶¶ 2–10; Declaration of William E. O'Brien ("O'Brien Decl."), Tab 5 to Defendant's First Appendix: *Sustained in part and overruled in part.* Although the O'Brien declaration fails to state that O'Brien is competent to testify or that his statements are made on personal knowledge, that is not *per se* fatal. The applicable rule, Fed.R.Civ.P. 56(e), requires not that an affiant state these things, but rather that the affidavit "be made on personal knowledge" and "show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, to the extent a sworn affidavit (such as the O'Brien declaration) clearly can be discerned to flow from personal knowledge of a competent affiant, it may be considered on summary judgment.

*See, e.g., Keating v. Bucks County Water & Sewer Auth.,* 2000 WL 1888770 at *4 (E.D.Pa.2000) (noting that, to extent averments in affidavit sworn to be "true and correct to the best of [affiant's] knowledge, information and belief" clearly were based on personal knowledge, they were appropriately considered on summary judgment); *Murray v. Bath Iron Works Corp.,* 867 F.Supp. 33, 38 n. 5 (D.Me.1994) ("[I]f it is clear that the affidavit statements are made on the basis of the affiant's personal knowledge, they satisfy the requirements of Rule 56(e), regardless of a blanket recitation stating otherwise."); *see also, e.g., Perez v. Volvo Car Corp.,* 247 F.3d 303, 315 (1st Cir.2001) (noting that application of Rule 56(e) "requires a scalpel, not a butcher knife. The *nisi prius* court ordinarily must apply it to each segment of an affidavit, not to the affidavit as a whole."). Guided by these precepts, I find the following portions of the O'Brien declaration admissible: paragraphs 1–3, 8–9, 11 and 13 and the first two sentences of paragraph 10, and the following inadmissible: paragraphs 4–7, 12 and the last sentence of paragraph 10.

3. Objection to paragraph 13 of the O'Brien declaration on the ground that it does not establish that it was Plaut's regular practice to make the documents described therein, and objection to the documents in question (Exhibits B–E to the O'Brien declaration) on the grounds that they lack proper authentication, contain hearsay and do not appear to be the type of documents that would be created as part of Plaut's regular practice, *see* Plaintiff's First Motion To Strike ¶¶ 11, 15; O'Brien Decl. ¶ 13 & Exhs. B–E thereto: *Overruled.* To meet the business-records exception to the hearsay rule, a custodian or other qualified witness must show, *inter*

ered in the event, and to the extent, the court overruled its objections.

*alia,* that the document in question was "kept in the course of a regularly conducted business activity, and ... it was the regular practice of that business activity to make" the document in question. Fed. R.Evid. 803(6). By stating that the documents in question "were prepared in the ordinary course of business by Plaut's project managers" and "have been maintained in the ordinary course of Plaut's business," O'Brien Decl. ¶ 13, O'Brien adequately establishes that documents of that nature customarily were prepared for projects such as the Uncle Henry's project.

4. Objection to Exhibit A to the O'Brien declaration (a report of Peter A. Tolusis) on grounds that (i) the entire report is hearsay of a non-party, (ii) to the extent any statements contained therein are attributed to persons other than Tolusis, such statements constitute hearsay within hearsay as described by Fed. R.Evid. 805, and (iii) substantial portions of the report are not based on personal knowledge, *see* Plaintiff's First Motion To Strike ¶¶ 12–14; Report of Peter A. Tolusis Regarding the Packing and Shipping of the Computer Equipment Belong[ing] to Uncle Henry's by Plaut Consulting, Inc. ("Tolusis Report"), attached as Exh. A to O'Brien Decl.: *Sustained.* Although O'Brien authenticates the document in question, *see* O'Brien Decl. ¶¶ 8–11; Fed. R.Evid. 901(b)(1), to the extent it is offered for the truth of the matter asserted (other than a relatively few non-substantive statements of Tolusis that are obviously based on personal knowledge), it does indeed constitute hearsay and, in part, hearsay within hearsay, none of which appears to fit within an exception to the hearsay rule.

5. Objection to the entirety of a declaration of Michael Picard found at Tab 6 on the ground that it is not made under oath or notarized, and to paragraph 9 of the Picard declaration on the ground that it is conclusory and, with respect to members of the Edge Wing team other than himself, not based on personal knowledge, *see* Plaintiff's First Motion To Strike ¶¶ 16–17; Declaration of Michael N. Picard ("Picard Decl."), Tab 6 to Defendant's First Appendix: *Overruled.* Affidavits need not be notarized to be cognizable on summary judgment so long as they are made under penalties of perjury in accordance with 28 U.S.C. § 1746. *See, e.g., Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 475 (6th Cir.2002) (noting, in context of summary judgment, "Peters contends that, because the document was not notarized or dated, it is not a valid 'affidavit.' While an 'affidavit' is required to be sworn to by the affiant in front of an 'officer authorized to administer oaths,' ... 28 U.S.C. § 1746 allows for 'unsworn declarations under penalty of perjury' to support any matter that legally requires an affidavit to support it."). The Picard declaration, in which Picard declares the truth of the statements made "under penalty of perjury" and signs "under the pains and penalties of perjury," Picard Decl., comports with the requirements of 28 U.S.C. § 1746. As to paragraph 9, Picard avers, and there is no reason to doubt, that he has personal knowledge of that (as well as his other) statements. *See* Picard Decl. ¶ 1. Given Picard's status as the Plaut vice-president who assembled the Uncle Henry's team, *see id.* ¶ 7, it is not at all improbable that he would have been in a position to know the team's intentions. To the extent the statement is conclusory, that alone is insufficient to bar its admission.

6. Objection to document contained at Tab 18 on the ground that it is an unsigned copy of a draft contract, *see* Plaintiff's First Motion To Strike ¶ 18; Master Agreement for Information Technology Services, Tab 18 to Defendant's First Appendix: *Overruled.* The fact that this

draft document is unsigned is not in itself surprising or significant; the issue is whether it is properly authenticated. Inasmuch as in its statement of material facts, Plaut cites this document (which is also marked as Deposition Exhibit D 169) in conjunction with testimony of Eric Stauffer authenticating it, the objection is overruled. *See* Defendant's SMF ¶ 33; Deposition of Eric P. Stauffer ("Stauffer Dep."), Tab 16 to Defendant's First Appendix, at 191.

7. Objection to paragraphs 9 and 10 of a declaration of Michael Pelletier found at Tab 40 to the extent concerning any statements by "Lou" at Atra Van Lines on the ground that such statements are hearsay, *see* Plaintiff's First Motion To Strike ¶ 19; Declaration of Michael Pelletier ("Pelletier Decl."), Tab 40 to Defendant's First Appendix: *Sustained.* These reported statements of third-party "Lou" (or "Lew") clearly are offered to prove the truth of the matter asserted and fit no discernible exception to the hearsay rule.

8. Objection to paragraphs 3 and 4 of a declaration of Dale Kerester found at Tab 41 to the extent describing contents of an attached letter on the ground that the letter itself is the best evidence of what it says, *see* Plaintiff's First Motion To Strike ¶ 20; Declaration of Dale C. Kerester Dated August 7, 2002 ("Kerester Decl."), Tab 41 to Defendant's First Appendix; Letter dated August 30, 2001 from Dale Kerester, Esq. to Edward P. Watt, Esq. ("Kerester Letter"), attached thereto: *Sustained. See, e.g., R & R Assocs., Inc. v. Visual Scene, Inc.,* 726 F.2d 36, 38 (1st Cir.1984) (noting that, although nothing prevents a declarant from testifying as to facts that also happen to be found in a writing, per Fed.R.Evid. 1002 the writing itself is required to "prove the content of a writing").

9. Miscellaneous objections to Kerester Letter, *see* Plaintiff's First Motion To Strike ¶¶ 21–24: *Overruled.* The majority of the passages about which Uncle Henry's expresses concern are not relied on by Plaut, which cites only two excerpts from the Kerester Letter in two statements of material facts. *See* Defendant's SMF ¶¶ 107, 111. Of the two excerpts cited, there is a live controversy only as to one: a paragraph that begins at the bottom of page 3 of the Kerester Letter and runs to the top of page 4, to which Uncle Henry's objects on the ground that it appears to be based on hearsay rather than Kerester's personal knowledge. Plaintiff's First Motion To Strike ¶ 24. This excerpt is relied on by Plaut for the proposition that "EdgeWing, by its counsel, notified Uncle Henry's that the equipment had been placed in storage at Atra Van Lines, provided Uncle Henry's with the contact information for Atra, and requested that Uncle Henry's make arrangements to retrieve the equipment." Defendant's SMF ¶ 107. These were all direct notifications/requests by Kerester and thus were within his personal knowledge.

### 2. Defendant's Motion To Strike (Docket No. 61)

I next turn to, and grant, Plaut's motion to strike statements Nos. 60–65 of the plaintiff's statement of additional material facts. *See* Defendant's Motion To Strike; Plaintiff's Genuine Issues of Material Fact ("Plaintiff's Additional SMF") (Docket No. 50) at 16–50, ¶¶ 60–65. The statements in question, which occupy thirty-four dense (single-spaced) pages, grossly violate the spirit and the letter of Local Rule 56. They are neither short, concise nor reflective of any effort to separate the wheat of materiality from the chaff of irrelevancy.[3]

3. For example, paragraph 65 catalogues incidents alleged to have been breaches of contract, *see* Plaintiff's Additional SMF at 46–50, ¶ 65; however, Plaut does not move for sum-

Nor are they supported by proper record citations, consisting instead of excerpts from allegations made in answers to interrogatories with respect to which it would be a monumental (if not impossible) task to discern the extent to which any are made on personal knowledge. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990) ("In summary judgment proceedings, answers to interrogatories are subject to exactly the same infirmities as affidavits. Although such answers may be given effect so far as they are admissible under the rules of evidence, they should be accorded no probative force where they are not based upon personal knowledge or are otherwise deficient.") (citations omitted). Statements of fact Nos. 60–65 accordingly are stricken.

### 3. Plaintiff's Second Motion To Strike (Docket No. 66)

In its second motion to strike, Uncle Henry's objects that Plaut impermissibly introduced new "rebuttal" evidence in support of its reply statements of material fact. Plaintiff's Second Motion To Strike ¶¶ 1–4; *see also* Supplemental Appendix of Documents in Support of Defendant's Response to Plaintiff's Genuine Issues of Material Fact and Defendants' [sic] Reply to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Defendant's Second Appendix"), filed with Defendants' Reply to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Defendant's Reply

SMF/Opposing") (Docket No. 57); Defendant's Response to Plaintiff's Genuine Issues of Material Fact ("Defendant's Reply SMF/Additional") (Docket No. 60).[4]

Local Rule 56(d) directs a movant replying to an opposition to a motion for summary judgment to file a reply statement of material facts "limited to any additional facts submitted by the opposing party," with denials and qualifications (if any) supported by appropriate record citations. So long as the reply statement is limited to those "additional facts," the introduction of new evidence in support thereof is entirely appropriate. Uncle Henry's errs in suggesting otherwise.[5]

 Uncle Henry's alternatively asks that the court strike materials found in Tabs 43–58 and 63–67 of the Defendant's Second Appendix on grounds that they are neither proper summary judgment materials nor properly authenticated. Plaintiff's Second Motion To Strike ¶ 5. The documents in question consist primarily of copies of e-mails. *See* Tabs 43–58, 63–67 to Defendant's Second Appendix. Uncle Henry's cites no authority for the proposition that copies of e-mails are not proper summary judgment materials, and I find none. However, e-mails (like letters and other documents) must be properly authenticated or shown to be self-authenticating. *See, e.g., United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir.2000) (noting, in context of challenge to authen-

mary judgment as to Uncle Henry's breach-of-contract claim.

4. Uncle Henry's suggests in passing, without citation to authority, that the introduction of rebuttal evidence by Plaut without further opportunity for response also would violate its due-process rights. Plaintiff's Second Motion To Strike ¶ 3. "It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed

waived." *Graham v. United States*, 753 F.Supp. 994, 1000 (D.Me.1990) (citation and internal quotation marks omitted).

5. I note, however, that in this case Plaut did not confine itself to replying only to Uncle Henry's "additional" facts; it also replied to Uncle Henry's denials and qualifications of Plaut's initial facts. *See* Defendant's Reply SMF/Opposing. This reply is not contemplated by Local Rule 56(d) and accordingly is stricken.

ticity of e-mails, "Under Fed.R.Evid. 901(a), documents must be properly authenticated as a condition precedent to their admissibility 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.'") (citations omitted).

Plaut does authenticate some of the documents to which Uncle Henry's objects by citing them together with deposition testimony that adequately explains them, to wit: Tab 44 (cited in Defendant's Reply SMF/Additional ¶ 8); Tab 45 (cited in Defendant's Reply SMF/Additional ¶¶ 8(a), 9 & 13(a)); and Tab 46 (cited in Defendant's Reply SMF/Additional ¶¶ 12–13). The remaining documents are either unaccompanied by any explanatory citation or accompanied by a citation that references the document in question but fails to lay an adequate foundation (for example, because the deponent did not recall the document).[6] On this basis, Tabs 43, 47–58 and 63–67 of the Defendant's Second Appendix are stricken.

## B. Cognizable Facts

With the foregoing preliminary issues resolved, the parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, reveal the following relevant to this recommended decision:

Uncle Henry's, a Maine corporation with its principal place of business at 525 Eastern Avenue, Augusta, Maine, publishes and distributes a "Swap or Sell It Guide," a weekly publication containing classified advertisements. Defendant's SMF ¶¶ 1–2; Plaintiff's Opposing SMF ¶¶ 1–2. Uncle Henry's operates its business at its facility in Augusta, Maine, including overall production and administrative work, receipt of orders, editing, artwork, book layout, accounts receivable and accounts payable. *Id.* ¶ 3. Its web-site business also is handled in Maine. *Id.* Approximately 75 to 80 percent of Uncle Henry's customers are from Maine, and less than 5 percent are from Massachusetts. *Id.* ¶ 4.

Uncle Henry's is solely owned by Joseph H. Sutton, who is also its president and treasurer. *Id.* ¶ 5. He has a residence in Maine, where he lives approximately four to six months of the year, and a ranch in Texas where he lives the remainder of the year. *Id.* Both Justin and Jason Sutton, who are the sons of Joseph Sutton and have been running the business of Uncle Henry's for the past fifteen years, were born in Maine and are full-time residents of Maine. *Id.* ¶ 6.

Plaut, a Delaware corporation with its principal place of business in Atlanta, Georgia, also maintains offices in Waltham, Massachusetts, Phoenix, Arizona and Birmingham, Alabama. Defendant's SMF ¶ 7; Answer/Counterclaims at 19, ¶ 1; Plaintiff's Answer and Affirmative Defenses to Defendants' Counterclaims ("Plaintiff's Answer") (Docket No. 16) ¶ 1; O'Brien Decl. ¶ 3.[7] EdgeWing was an unincorporated division of Plaut. Defendant's SMF ¶ 7; Answer/Counterclaims at 19, ¶ 1; Plaintiff's Answer ¶ 1. At all relevant times, Plaut provided management consulting, information-technology inte-

---

**6.** Nor does Plaut, in its opposition to the Plaintiff's Second Motion To Strike, provide any argument why these documents should be considered self-authenticating. *See* Opposition to Plaintiff's Motion To Strike Defendant's Exhibits Tabs 43–67 (Docket No. 67).

**7.** As Uncle Henry's points out, Plaintiff's Opposing SMF ¶ 7, at the time Plaut filed a motion to transfer venue in this case it stated that its principal place of business was in Massachusetts, *see* Plaut Consulting Inc.'s and EdgeWing's Motion To Transfer Venue to the District of Massachusetts, etc. ("Venue Motion") (Docket No. 13) at 5–6 n. 3.

gration, e-business solutions, SAP consulting and outsourcing and hosting services. Defendant's SMF ¶ 8; Plaintiff's Opposing SMF ¶ 8.[8]

Uncle Henry's first web site went online in 1999. *Id.* ¶ 15. Its sole shareholder, Joseph Sutton, characterized its web-site development efforts prior to EdgeWing's engagement as "unsuccessful." *Id.* ¶ 16. Uncle Henry's began negotiating with a number of different information-technology companies beginning in June 2000 with respect to a redesign of its web site. *Id.* ¶ 17. It provided three web-site development companies, including EdgeWing, with the same list of features and functionality so that it could perform an "apples-to-apples" comparison of the proposals. *Id.* ¶ 18.

After meeting with Uncle Henry's in its offices in Augusta, Maine and receiving the list provided by Uncle Henry's, EdgeWing submitted a proposed statement of work to Uncle Henry's dated July 30, 2000. *Id.* ¶ 19. Two other companies, Stroudwater and Newton Online, submitted proposals. *Id.* ¶ 20. Uncle Henry's rejected EdgeWing's bid of $717,600, which was the highest submitted. *Id.* ¶¶ 21–22. Uncle Henry's asked EdgeWing to lower its bid, and the two continued to negotiate. *Id.* ¶¶ 23–24.

Uncle Henry's relied on counsel to conclude discussions with EdgeWing. Defendant's SMF ¶ 25; Deposition of Justin Sutton ("Justin Sutton Dep."), Tab 12 to

Defendant's First Appendix, at 171.[9] Starting in mid-September 2000 Eric Stauffer, Esq., of Preti, Flaherty, Beliveau, Pachios & Haley ("Preti, Flaherty") represented Uncle Henry's in negotiations with EdgeWing. Defendant's SMF ¶ 26; Plaintiff's Opposing SMF ¶ 26. Stauffer is experienced in the representation of clients in the acquisition, sale and/or licensing of computer software and handles or supervises much of Preti, Flaherty's work with clients engaged in buying and selling computer hardware and software and other high-technology products. *Id.* ¶ 27. Stauffer, on behalf of Uncle Henry's, performed a due-diligence investigation of EdgeWing, including reviewing Plaut's web site, checking the web sites of companies that provided testimonials for Plaut, reviewing Dunn and Bradstreet reports, reviewing information about the formation of Plaut's EdgeWing division and reviewing information about Plaut's affiliates. *Id.* ¶ 28.

In addition to due diligence performed by its counsel, Uncle Henry's management also performed due diligence regarding Plaut and EdgeWing prior to entering into any agreement with Plaut/EdgeWing. Defendant's SMF ¶ 55; Deposition of Jason Sutton ("Jason Sutton Dep."), Tab 13 to Defendant's First Appendix, at 196.[10] Among other due diligence, Uncle Henry's management inspected EdgeWing's facilities, inquired about other projects performed by Ed-

---

8. I disregard Uncle Henry's attempted qualification that "most of the services provided in these areas by Plaut were in SAP applications, which is a very different technology from pure internet based applications like Uncle Henry's," inasmuch as it is not fully supported by the citation given. *See* Plaintiff's Opposing SMF ¶ 8.

9. Plaut's further statement that those discussions covered "revisions to a Master Agreement and Website Development Statement of

Work," Defendant's SMF ¶ 25, is neither admitted nor supported by the citation given.

10. Uncle Henry's attempts to deny this statement to the extent that "due diligence" is a conclusion rather than a fact, *see* Plaintiff's Opposing SMF ¶ 55; however, the question asked was whether "any kind of due diligence or investigation of EdgeWing" was conducted, *see* Jason Sutton Dep. at 196.

geWing, reviewed information given by EdgeWing pertaining to other projects, contacted references, inquired about other projects performed by Michael Picard of EdgeWing and reviewed other information provided by Picard about other projects performed by him. Defendant's SMF ¶¶ 29, 56; Plaintiff's Opposing SMF ¶¶ 29, 56. Jason Sutton contacted references provided by EdgeWing, who, according to Sutton, "had mutual positive things to say in overall perception of their participation." *Id.* ¶ 57.

Prior to entering into any agreement, EdgeWing gave Uncle Henry's copies of Plaut/EdgeWing press releases dated June 2000 announcing the formation of the EdgeWing group, as well as other materials about EdgeWing's creation, roots, management and customers. *Id.* ¶ 58. Jason Sutton also searched the Internet regarding EdgeWing on or prior to October 13, 2000. *Id.* ¶ 59. He located, reviewed and forwarded to Justin Sutton press releases relating the circumstances of Plaut's formation of its EdgeWing division on July 1, 2000. *Id.*

On October 17, 2000 Picard sent Justin Sutton a version of the Master Agreement and Website Development Statement of Work (the latter, "SOW"), stating that it was "for your signature." Plaintiff's Additional SMF ¶ 8(a); Defendant's Reply SMF/Additional ¶ 8(a).[11] On October 20, 2000 Justin Sutton signed this version of the Master Agreement and SOW, as well as a web-hosting agreement dated October

10, 2000, and sent them to Picard. *Id.* ¶ 9.[12] At the same time that he signed and returned the agreements, Justin Sutton signed a check to EdgeWing in the amount of $202,000, representing $196,000 for the first installment on the SOW and $6,000 for hosting fees. *Id.* ¶ 10.

On October 30, 2000 Picard e-mailed Justin Sutton, saying, "Paul Shaughnessy [president of Plaut][13] was out sick last week and we didn't get a change [sic] to do the final review of the M.S.A. § until today. We got our legal council [sic] involved to do the final pass on what your legal proposed. I made the final recommendations to sections 11.15 and 7.2C. Please review the highlighted comments and corrections and let me know if you're okay with the changes." Defendant's Reply SMF/Additional ¶ 11; E-mail dated October 30, 2000 from *picard@edgewing.com* to *justin@unclehenrys.com*, Tab 19 to Plaintiff's Revised Appendix of Documents in Support of Statement of Genuine Issues of Material Fact ("Plaintiff's Appendix"), filed with Plaintiff's Opposing SMF and Plaintiff's Additional SMF. Justin Sutton knew that Shaughnessy was unwilling to sign the document in the form that he (Justin Sutton) had signed. Defendant's Reply SMF/Additional ¶ 11; Justin Sutton Dep. at 159–62.

On or after November 3, 2000 EdgeWing sent to Justin Sutton revised versions of the Master Agreement and SOW that had been signed by Shaughnessy (on the Master Agreement) and Picard (on the

**11.** Although Uncle Henry's describes this as the "final" version of the contract, Plaintiff's Additional SMF ¶ 8(a), I delete that characterization (which is denied by Plaut, *see* Defendant's Reply SMF/Additional ¶ 8(a)), on the bases that it (i) is not used in the underlying e-mail cited by Uncle Henry's and (ii) represents a legal conclusion rather than a fact.

**12.** Plaut denies that this was the "final" version of the parties' agreement, noting that on November 28, 2000 Stauffer referred to the version of the Master Agreement transmitted by Picard on October 17 as a "draft." Defendant's Reply SMF/Additional ¶ 9; Stauffer Dep. at 183–84.

**13.** Defendant's SMF ¶ 30; Plaintiff's Opposing SMF ¶ 30.

SOW) on or about that date. Plaintiff's Additional SMF ¶ 12; Defendant's Reply SMF/Additional ¶ 12. Uncle Henry's did not sign the document. *Id.* Also on or about November 3, 2000 EdgeWing cashed Uncle Henry's check in the amount of $202,000. *Id.* ¶ 13.

Uncle Henry's counsel, Stauffer, received a copy of the Master Agreement and SOW executed by EdgeWing. Defendant's Reply SMF/Additional ¶ 13; Stauffer Dep. at 176–77. During November 2000 Stauffer, on behalf of Uncle Henry's, negotiated with Picard of EdgeWing regarding the terms of the Master Agreement and SOW. Defendant's SMF ¶ 29; Picard Decl. ¶ 8.[14] In accordance with the authorization he had received from Shaughnessy, Picard communicated EdgeWing's agreement to the Master Agreement and SOW to Stauffer by e-mail and by telephone on November 30, 2000. Defendant's SMF ¶ 30; Plaintiff's Opposing SMF ¶ 30.[15] Picard sent an e-mail to Stauffer on November 30, 2000 stating that he had made the necessary changes to the Master Agreement and attaching a final Master Agreement and SOW. *Id.*[16] Picard further stated in his e-mail, "[I]f we are in agreement we can put it to print tomorrow." *Id.*

Stauffer made sure that "everything was in the agreement" because the Master Agreement and SOW had an integration clause. *Id.* ¶ 31. He determined that no further changes to the November 30, 2000 final Master Agreement and SOW needed to be made and it was ready for Uncle Henry's signature. *Id.* ¶ 32.

On November 30, 2000 Stauffer sent an e-mail to Picard, with an e-mail copy to Jason Sutton, replying to Picard's November 30 e-mail and stating, "Mike: it looks good to sign. Thank you. Rick." *Id.* ¶ 34. Stauffer told Picard that he approved of the November 30, 2000 final Master Agreement and SOW, that he would deliver that document to Uncle Henry's for signature and that Uncle Henry's would then forward to EdgeWing an executed original. *Id.* ¶ 35. Stauffer then hand-delivered the final Master Agreement and SOW to Uncle Henry's for execution by Uncle Henry's. *Id.* ¶ 36. He had reviewed every point in the Master Agreement and SOW, including the scope matrix appearing at section 2.2 of the SOW, before delivering the document to Uncle Henry's for execution. *Id.* ¶ 37.

Stauffer was not aware of any prior agreement, understanding, negotiation or discussion that he believed should have been set forth in the Master Agreement or SOW. *Id.* ¶ 38. Justin Sutton signed the final version of the Master Agreement and SOW on behalf of Uncle Henry's on December 7, 2000. *Id.* ¶ 39. Justin Sutton understood that the Master Agreement

14. Uncle Henry's attempts to deny this, stating that the terms of the Master Agreement and SOW were finalized on October 20, 2000 and, although Plaut "later tried changing the terms and new negotiations ensued, ... no other Master Agreement was signed by both parties." Plaintiff's Opposing SMF ¶ 29. However, this statement accords with, rather than controverts, Plaut's statement that in November 2000 further negotiations ensued. Nonetheless, I omit Plaut's characterization of the November negotiations as leading up to conclusion of a "final" agreement inasmuch as its "finality" is a legal conclusion.

15. Uncle Henry's denies the reference in the first sentence of statement No. 30 to a "final" Master Agreement. *See* Plaintiff's Opposing SMF ¶ 30. For the reasons discussed above, I omit this characterization.

16. Among other things, Stauffer and Picard negotiated a change limiting the amount of attorney fees recoverable to twenty percent of the amount of the applicable statement of work. Defendant's Reply SMF/Additional ¶ 13(a); Stauffer Dep. at 179–80.

and SOW he signed on December 7, 2000 set forth the agreement between the parties as identified within the document. *Id.* ¶ 41.

The Master Agreement and SOW signed by Justin Sutton on December 7, 2000 contains an "integration clause" at section 11.11 providing:

This Master Agreement and each of the SOWs hereto, including any Exhibits, constitute the entire agreement between the parties pertaining to the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties pertaining to the subject matter hereof.

*Id.* ¶ 42.[17] Section 7.1 of the Master Agreement provides:

EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT OF THE APPLICABLE STATEMENT OF WORK, EDGEWING MAKES NO WARRANTIES IN CONNECTION WITH THE PROVISION OF SERVICES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED INCLUDING; BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE, OR

FREEDOM FROM INFRINGEMENT OF THIRD PARTY PRODUCTS.

Defendant's SMF ¶ 43; 12/7/00 Master Agreement/SOW at 8.[18] Section 7.2(a) of the Master Agreement provides:

In no event shall EDGEWING be liable to the Company for any matter arising pursuant to or in connection with this Agreement except for the actual damages caused by EDGEWING's breach of this agreement, negligence or willful misconduct. If EDGEWING is liable to the Client, it shall in no event be liable for an amount in excess of the full amounts paid or payable by the Company under the applicable Statement of Work. In no event shall EDGEWING be liable, for any reason, for consequential, incidental, special or indirect damages (including loss of profits or business opportunities); damages for loss of or damage to recorded data; or damages suffered by third parties, regardless of whether EDGEWING has been advised of or is aware that such damages have be [sic] anticipated or may be incurred. The sole remedy of the Company for failure by the [sic] EDGEWING to adhere to the Service Levels shall be an adjustment to the compensation received by EDGEWING, as provided in the Statement of Work or in the case that that [sic] repeated failures to achieve the Service Levels shall constitute a materi-

17. The Master Agreement and SOW, while technically two separate agreements, are integrated into one document bearing consecutively numbered pages. *See generally* Master Agreement for Information Technology Services signed by Justin Sutton on December 7, 2000 ("12/7/00 Master Agreement/SOW"), Tab 20 to Defendant's First Appendix. The SOW commences at page 17 of the integrated document.

18. Uncle Henry's attempts to deny or qualify this and other provisions of the Master Agreement and SOW signed on December 7, 2000 on the ground that they are inconsistent with

the version of the parties' contract provided by EdgeWing in discovery in this case, which was signed by Justin Sutton and delivered to Plaut on or about October 20, 2000. *See* Plaintiff's Opposing SMF ¶¶ 43–46, 48. Although Plaut did not have in its files an original or copy of the version of the Master Agreement and SOW Justin Sutton signed on December 7, 2000, Plaintiff's Additional SMF ¶ 13(a); Defendant's Reply SMF/Additional ¶ 13(a), this is not fatal to a finding that the December 7 version was in fact the final, binding version. For reasons discussed below, I so find.

al default the Company may terminate this Agreement under the terms of Section 5.3(a).

Defendant's SMF ¶ 44; 12/7/00 Master Agreement/SOW at 8. In addition, section 2.2 of the SOW provides, in part: "In the event this Statement of Work is terminated for material default as provided in Section 5.3(a) of the Master Agreement, Buyer shall be entitled, at UncleHenry's [sic] option to, among other remedies, (i) a complete refund of amounts paid hereunder plus relocation costs under Section 5.3, or (ii) reasonable costs of cover in obtaining development services from another qualified provider of the Services described herein as necessary to attain go live status for such a Web site." Defendant's SMF ¶ 45; 12/7/00 Master Agreement/SOW at 17–18.

Section 11.16 of the Master Agreement provides:

> In the event of such a default and failure to cure on the part of either party hereto, the other shall be entitled to recover its cost of collecting any amounts due on account of such default, including reasonable attorney fees up to 20% of the related Statement of Work.

Defendant's SMF ¶ 46; 12/7/00 Master Agreement/SOW at 16. The SOW provides that "[a]ll of the provisions of the Master Agreement are incorporated into this Statement of Work." Defendant's SMF ¶ 47; Plaintiff's Opposing SMF ¶ 47.

Section 2.2 of the SOW also provides:

> Generally, the Services will result in the design and development of a WEB site for the Company that provides the features and functionality described below.... More specifically, Plaut will provide UncleHenry's [sic] with the following project services:

> Develop a new site with the that [sic] includes the following scope items:

[five-page scope matrix follows]

> Additions or deletions in scope will impact the overall project costs. Any changes in the above scope will result in a change order with applicable costs or savings.

*Id.* ¶ 48. Section 2.6 provides that the "Services contemplated by this Scope of Work will be performed in accordance with the Project Schedule set forth in Section 5 below." *Id.* ¶ 49. Pursuant to section 2.6B, Uncle Henry's and EdgeWing agreed that, in the event of changes to the Schedule resulting from the preparation of such work plans, no additional notification would need be given to either party except as provided in the Master Agreement and SOW. *Id.* Section 2.6C provides: "When approved by Uncle Henry's and EdgeWing, such work plans become effective and supersede any and all agreements, understanding[s] and expectations with respect to the previous work plans and shall become a part hereof without amendment of this Statement of Work." *Id.*

The payment schedule for the SOW is set forth in section 6 of that document. The total contract price is $593,000, payable in six payments of $196,000 at signing; $65,000 at satisfactory completion of Phase I; $65,000 at satisfactory completion of Phase II; $71,000 at satisfactory completion of Phase III; $98,000 at satisfactory completion of Phase IV; and $98,000 thirty days after satisfactory completion of Phase V. *Id.* ¶ 50. Uncle Henry's paid $196,000 at the commencement of the engagement, but was not invoiced and did not pay EdgeWing any additional amount for the web-site development project. *Id.* ¶ 51.

Section 11.9 of the Master Agreement provides: "The provision[s] of this Agreement shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts without re-

gard to its conflict of law principles." *Id.* ¶ 52.

In its answers to interrogatories, Uncle Henry's identifies thirty-one alleged misrepresentations by EdgeWing. Defendant's SMF ¶ 53; Plaintiff's Third Supplemental Responses to Defendants' First Set of Interrogatories ("Plaintiff's Third Interrog. Answers"), Tab 15 to Defendant's First Appendix, at 10–12, 27–32.[19] In its third supplemental response (served at the conclusion of discovery) to interrogatory No. 5 in the defendant's first set of interrogatories, which requested that Uncle Henry's state the basis for its contention in paragraph 35 of its amended complaint that the alleged misrepresentations were "made by EdgeWing with knowledge of their falsity or recklessly without regard to whether they were true," Uncle Henry's entire response was as follows: "Uncle Henry's believes that the misrepresentations are such that they could not be the result of mere negligence but could only have been the result of recklessness or an intent to deceive." Defendant's SMF ¶ 54; Plaintiff's Opposing SMF ¶ 54.

The team hired by Edge Wing went to work on the Uncle Henry's project in mid-October 2000. Plaintiff's Additional SMF ¶ 14/Defendant's Reply SMF/Additional ¶ 14. On November 9, 2000 Edge Wing project manager Helen Jones wrote to Deborah Walters and other Edge Wing personnel, noting that delays in setting up an appropriate infrastructure, among other things, had already resulted in a minimum seven-week delay in completing the project based on a "best case of infrastructure in place by 12/10/00," moving the go-live date from January 19, 2000 to March 2, 2000. Plaintiff's Additional SMF ¶ 27; E-mail dated November 9, 2000 from Helen Jones to Deborah Walters ("Jones E–Mail"), Tab 26 to Plaintiff's Appendix; Defendant's SMF ¶ 63; Plaintiff's Opposing SMF ¶ 63.[20] Despite knowing that the infrastructure and other problems would delay the project by at least seven weeks, EdgeWing only discussed with Justin Sutton a two-week concession on the "go-live" date. Plaintiff's Additional SMF ¶ 27; Jones E–Mail.[21]

As of late December 2000 or early January 2001, Justin Sutton knew that Uncle Henry's new web site would not be going live as of January 19 and that the dates for release of the new web site would have to be extended. Defendant's SMF ¶ 92; Plaintiff's Opposing SMF ¶ 92. Although the SOW set forth a "go-live" date of January 19, 2001, Uncle Henry's received documents from EdgeWing that stipulated an extended go-live date for the new web site. *Id.* ¶ 93. Uncle Henry's, by e-mail

19. For the sake of brevity I do not here set forth the thirty-one alleged misrepresentations, which are summarized in a schedule appended to the defendant's statement of material facts, *see* Uncle Henry's Alleged Misrepresentations from Third Supplemental Responses to Interrogatory No. 4 ("Schedule of Alleged Misrepresentations"), Schedule A to Defendant's SMF, and discussed individually to the extent necessary in my analysis, below.

20. Plaut objects that this statement is not supported by the citation given, *see* Defendant's Reply SMF/Additional ¶ 27; however, it is in the main accurate. As Plaut notes, Jones attributed four weeks of the expected delay to infrastructure problems, one week to a delay in starting the project and two weeks to an underestimation of development time. *Id;* Jones E–Mail.

21. Plaut objects on the ground that this statement relies on materials not properly considered on summary judgment, but fails to make clear in what respect that is so. Defendant's Reply SMF/Additional ¶ 28. Plaut also attempts to qualify this statement on the ground that Justin Sutton knew of project delays, *see id.,* but none of the materials cited makes clear that he knew as of November 9, 2000 that a seven-week delay was contemplated.

dated March 20, 2001 to EdgeWing, authorized change orders totaling $52,100 for work to be performed well after the original January 19 go-live date had passed. *Id.* ¶ 98.

Uncle Henry's terminated the web-site development project on July 18, 2001. *Id.* ¶ 100. By letter dated August 22, 2001 Uncle Henry's requested that EdgeWing deliver certain "non-production" computer equipment that it had provided to EdgeWing for use at EdgeWing's office on the web-site development project to Uncle Henry's premises in Maine no later than 4 p.m. on August 23, 2002. *Id.* ¶ 101. Prior to delivery of the equipment to Uncle Henry's, EdgeWing's outside counsel stated to Uncle Henry's counsel, both orally and in writing, that Uncle Henry's acceptance of delivery of the equipment would not constitute a waiver, release or discharge of any of Uncle Henry's claims. *Id.* ¶ 102.

EdgeWing caused Atra Van Lines to attempt delivery of the non-production equipment to Uncle Henry's in Augusta, Maine on August 23. *Id.* ¶ 103. Uncle Henry's counsel was advised on August 23, 2001 that the non-production equipment was in transit to Uncle Henry's. *Id.* ¶ 104. Uncle Henry's rejected EdgeWing's attempt to effect delivery of the equipment on August 24, 2001. *Id.* ¶ 106. EdgeWing, by its counsel, notified Uncle Henry's that the equipment had been placed in storage at Atra Van Lines, provided Uncle Henry's with the contact information for Atra and requested that Uncle Henry's make arrangements to retrieve the equipment. *Id.* ¶ 107. Uncle Henry's has not retrieved the equipment from Atra Van Lines. *Id.* ¶ 108. The equipment remains in storage at Atra Van Lines, available for retrieval by Uncle Henry's. *Id.* ¶ 109.

Uncle Henry's delivered to EdgeWing on or about December 11, 2000 certain "production" equipment—the computer equipment that Uncle Henry's had used to host its current web site. *Id.* ¶ 110. EdgeWing, by letter from its counsel faxed and mailed to Uncle Henry's counsel on August 30, 2001, requested that Uncle Henry's make arrangements for the pickup of Uncle Henry's production equipment. *Id.* ¶ 111. Uncle Henry's has not made any arrangements to retrieve its production equipment. *Id.* ¶ 112.[22]

The contracts at issue in the instant lawsuit were negotiated in large part in Maine. Defendant's SMF ¶ 114; Affidavit of Jason H. Sutton, etc. ("Jason Sutton Aff."), Tab 2 to Defendant's First Appendix, at 2. After two days of intensive meetings in Uncle Henry's office in Augusta, Uncle Henry's received communications by telephone and e-mail in Maine and communicated with EdgeWing by telephone and e-mail from Maine. *Id.* Uncle Henry's signed the primary contract documents in Maine. *Id.* During negotiations, Justin and Jason Sutton took only one trip to EdgeWing's facilities in Massachusetts.

---

**22.** Uncle Henry's endeavors to paint a dramatically different picture, stating that (i) its demands "to pick up the material" were refused, (ii) it made several efforts to pick up "the equipment," which were "denied," and (iii) Plaut "attempted to extort a release out of Uncle Henry's in exchange for return of the equipment, which Uncle Henry's refused." Plaintiff's Additional SMF ¶¶ 48–50. Plaut objects on grounds that these statements are both insufficiently specific and supported by citations to material not properly considered on summary judgment—*i.e.*, answers to interrogatories that are not clearly made on personal knowledge. Defendant's Reply SMF/Additional ¶¶ 48–50; *see also id.* ¶ 1. I agree, and accordingly disregard the statements in question. A further statement by Uncle Henry's that it refused delivery of the equipment in part because it learned that Plaut had threatened to tamper with it, Plaintiff's Additional SMF ¶ 51, is neither admitted nor supported in the main by the citation given.

Defendant's SMF ¶ 115; Plaintiff's Opposing SMF ¶ 115.

All of the alleged acts or practices that Uncle Henry's contends constitute violations of the Massachusetts Consumer Protection Act are alleged misrepresentations received and relied upon by Uncle Henry's in Augusta, Maine. Defendant's SMF ¶ 116; Plaintiff's Third Interrog. Answers at 32, 45–47. However, some of the alleged twenty-three acts or practices (Nos. 1–3, 5–6, 8–11, 13–14, 17 and 19) were received in Waltham, Massachusetts, as well. Plaintiff's Opposing SMF ¶ 116; Plaintiff's Third Interrog. Answers at 32, 45–47. Uncle Henry's admits that the damages it allegedly incurred were incurred primarily in Maine. Defendant's SMF ¶ 117; Plaintiff's Opposing SMF ¶ 117. With respect to web-site development, the bulk of the programming work initially was done by Plaut at its facilities in Georgia, later moving to Massachusetts. Plaintiff's Opposing SMF ¶ 118; Jason Sutton Aff. at 3. Uncle Henry's moved its existing web site to Plaut's facility in Waltham, Massachusetts for hosting on or about December 13, 2000, where it remained and was hosted and administered by Plaut until on or about August 24, 2001. Plaintiff's Additional SMF ¶ 53; Defendant's Reply SMF/Additional ¶ 53.[23]

### III. Analysis

### A. Count I: Massachusetts Unfair Trade Practices Act

In Count I of its amended complaint, Uncle Henry's alleges that Plaut's conduct violated sections 2 and 11 of the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws ch. 93A ("Chapter 93A"). Complaint ¶¶ 29–31. Plaut argues, *inter alia*, that it cannot be held liable for a Chapter 93A violation inasmuch as the acts or omissions in issue "did not occur primarily and substantially within Massachusetts." Defendant's SJ Motion at 16–17. I agree.

Section 11 of Chapter 93A provides, in relevant part:

> No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person *claiming* that such transactions and actions did not occur primarily and substantially within the commonwealth.

As a threshold matter, Uncle Henry's posits that Plaut cannot meet this burden because it is in effect judicially estopped from claiming that the underlying events are substantially connected to any state other than Massachusetts. Plaintiff's Response to Defendants' Motion for Summary Judgment ("Plaintiff's SJ Opposition") (Docket No. 39) at 17–18; *see also id.* at 11–12. As Uncle Henry's notes, *id.* at 11, on November 29, 2001 Plaut filed a motion pursuant to 28 U.S.C. § 1404(a) for

---

23. Plaut objects to Uncle Henry's additional statements Nos. 54 and 56–59 on the ground that they are not supported by materials properly considered on summary judgment. *See* Defendant's Reply SMF/Additional ¶¶ 54, 56–59; *see also id.* ¶ 1. These objections are sustained. Statement No. 54 is supported by an answer to an interrogatory as to which it is not clear that the declarant possesses the requisite personal knowledge. *See* Plaintiff's Additional SMF ¶ 54. Statements Nos. 56–59 are supported by excerpts from briefs filed in support of and opposition to Plaut's motion to transfer venue, filed earlier in this case. *See* Plaintiff's Additional SMF ¶¶ 56–59. I note that while the parties' briefs do not set forth "facts," I take judicial notice of the arguments made therein as part of my analysis of the merits of a judicial estoppel argument advanced by Uncle Henry's.

transfer of venue of the instant action to the District of Massachusetts, *see* Venue Motion at 1.

Under the sub-heading "Massachusetts Has the Most Significant Relationship and Level of Contact with the Transactions and Parties," Plaut argued that in view of assertions made by Uncle Henry's, including its allegation in the complaint that Massachusetts bore the most significant relationship to the parties and transaction, "any opposition by Uncle Henry's [to] the requested transfer ... should be rejected." Venue Motion at 6–7; *see also* Plaut Consulting Inc.'s and EdgeWing's Reply to Plaintiff's Response to Motion To Transfer Venue ("Venue Reply") (Docket No. 21) at 5. Plaut further argued, under the heading "Massachusetts Law Applies to this Action," that Uncle Henry's had, *inter alia,* attempted to invoke the remedies of Chapter 93A. Venue Motion at 10–11; *see also* Venue Reply at 5.

■ To successfully invoke the doctrine of judicial estoppel, "the proponent must show that the party to be estopped had succeeded previously with a position directly inconsistent with the one [he] currently espouses." *Faigin v. Kelly,* 184 F.3d 67, 82 (1st Cir.1999) (citation and internal quotation marks omitted). Uncle Henry's makes neither showing. Plaut did not directly espouse the positions in question; rather, it took care to make clear that it relied on Uncle Henry's asseverations. In any event, Plaut did not succeed; the motion to transfer venue was denied. *See* Endorsement to Venue Motion.

Plaut is thus free to argue—and succeeds in demonstrating—that its asserted violations of Chapter 93A did not occur "primarily and substantially" in Massachusetts. Specifically, Plaut shows that (i) Uncle Henry's is a Maine corporation, and its principals (Jason and Justin Sutton) live and work in Maine, (ii) the contracts in issue were negotiated in large part in Maine, (iii) although thirteen of the twenty-three alleged misrepresentations underpinning Count I were made in Massachusetts as well as Maine, all twenty-three were made in Maine, and (iv) Uncle Henry's admits that the damages it allegedly occurred as a result were primarily incurred in Maine.

■ The First Circuit has distilled from the "sparse" body of relevant Massachusetts precedent "three basic factors" bearing on the question whether conduct occurred "primarily and substantially" in Massachusetts for purposes of section 11 of Chapter 93A: "(1) where defendant committed the deception; (2) where plaintiff was deceived and acted upon the deception; and (3) the situs of plaintiff's losses due to the deception." *Roche v. Royal Bank of Canada,* 109 F.3d 820, 829 (1st Cir.1997). Of these, the first factor "is the least weighty of the three factors." *Id.* To the extent that a message originates in Massachusetts but its "receipt and impact occur[ ] centrally in another state," an alleged misrepresentation does not occur "primarily and substantially" in Massachusetts for purposes of section 11 of Chapter 93A. *M & I Heat Transfer Prods., Ltd. v. Gorchev,* 141 F.3d 21, 23 (1st Cir.1998); *see also, e.g., Bushkin Assocs., Inc. v. Raytheon Co.,* 393 Mass. 622, 473 N.E.2d 662, 672 (1985) ("Raytheon has met its burden of showing that the transactions and actions on which Bushkin relies did not occur primarily in Massachusetts. The telephone conversations were between [Bushkin in] New York and [Raytheon in] Massachusetts. The alleged unfair or deceptive acts or practices were statements made in Massachusetts but received and acted on in New York. Any loss was incurred in New York.") (citation omitted). Here, as in *M & I Heat* and *Bushkin,* the alleged misrepresentations were received

primarily in Maine, where their impact primarily was felt.[24]

Inasmuch as Plaut meets the burden of demonstrating that the conduct underpinning Count I did not take place "primarily and substantially" in Massachusetts, it is entitled to summary judgment as to Count I.

## B. Counts III–IV: Fraud and Negligent Misrepresentation

In Counts III and IV of its amended complaint Uncle Henry's brings common-law causes of action for fraud and negligent misrepresentation predicated on thirty-one alleged misrepresentations. Complaint ¶¶ 34–37; *see also* Defendant's SMF ¶ 53; Plaintiff's Third Interrog. Answers at 10–12, 27–32.

■ As a threshold matter, the parties disagree as to which state's law applies to these counts. *Compare* Defendant's SJ Motion at 8 & n. 6 *with* Plaintiff's SJ Opposition at 10–12. Both concur that (i) in the context of Counts III–IV, their contractual choice-of-law provision is inapposite and (ii) the court must follow the choice-of-law rules of Maine, the forum state. Defendant's SJ Motion at 8 n. 6; Plaintiff's SJ Opposition at 10–11. However, Uncle Henry's argues that the relevant factors tilt in favor of application of Massachusetts law, while Plaut reasons that Maine law ought to apply. Defendant's SJ Motion at 8 n. 6; Plaintiff's SJ Opposition at 10–12. Again, Plaut has the better of the argument.[25]

In analyzing questions such as this, Maine has followed the approach of the Restatement (Second) of Conflict of Laws. *See, e.g., Adams v. Buffalo Forge Co.,* 443 A.2d 932, 934–35 (Me.1982). As Plaut notes, Defendant's Summary Judgment Reply Memorandum of Law ("Defendant's SJ Reply") (Docket No. 58) at 3–4, the Restatement section most on point is section 148, which pertains to fraud and misrepresentation, *see* Restatement (Second) of Conflict of Laws § 148 (1971). This section provides, in relevant part:

> (2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
>
> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

24. Uncle Henry's suggests that this case is distinguishable from *M & I Heat* and *Bushkin* in that this case reflects a greater preponderance of Massachusetts contacts. *See* Plaintiff's SJ Opposition at 20–21. However, most of the contacts Uncle Henry's enumerates have no clear relevance to the "three basic factors" sketched out by the First Circuit. *See id.* at 18–19.

25. To the extent Uncle Henry's relies on judicial estoppel, *see* Plaintiff's SJ Opposition at 11–12, its argument is misguided for the reasons discussed in the context of Count I, above.

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2) (1971). The evidence in this case reflects that (i) Uncle Henry's acted in reliance upon the alleged representations primarily in Maine, although also in Massachusetts, (ii) as to the nineteen statements with respect to which there is cognizable evidence of locus of receipt, Uncle Henry's received all in Maine, although it also received thirteen in Massachusetts,[26] (iii) Plaut fairly can be inferred to have made most of the representations from outside of Maine, including from Massachusetts, and (iv) Uncle Henry's is a Maine corporation with its principal place of business in Maine, while Plaut is a Delaware corporation that maintained its principal place of business in Massachusetts during the time of the alleged misrepresentations but now lists its principal place of business as Georgia. To the extent there was a "tangible" thing that was the "subject" of this transaction, work on the Uncle Henry's contract was performed in Georgia and Massachusetts, and Plaut hosted Uncle Henry's web site from Massachusetts from December 2000 through August 2001.

Per relevant Restatement commentary:

*f.* ... Plaintiff's action in reliance provides a more important contact when it is confined to a single state than when it is divided among two or more. When a major part of the action in reliance takes place in one state and a lesser part in another, the first state has a more important contact with the occurrence than does the latter.

When plaintiff's action in reliance is taken pursuant to the terms of an agreement made by the plaintiff with the defendant, or is otherwise of a sort contemplated by the defendant, the place of reliance is a more important contact than it is in other situations....

*j. The general approach....* If any two of the above-mentioned contacts, apart from the defendant's domicil, state of incorporation or place of business, are located wholly in a single state, this usually will be the state of the applicable law with respect to most issues. So when the plaintiff acted in reliance upon the defendant's representations in a single state, this state will usually be the state of the applicable law, with respect to most issues, if (a) the defendant's representations were received by the plaintiff in this state, or (b) this state is the state of the plaintiff's domicil or principal place of business....

Restatement (Second) of Conflict of Laws § 148 cmts. f & j (1971). In this case, although no two contacts were located "wholly" within Maine, I find that the aggregation of contacts counsels in favor of application of Maine law given Maine's status as (i) the state of Uncle Henry's incorporation and primary place of business, (ii) the state in which Uncle Henry's received all alleged misrepresentations as to which there is cognizable evidence of locus of receipt (although many of the same misrepresentations also were received in Massachusetts) and (iii) the state in which Uncle Henry's primarily relied on the representations in question (which, significantly, arose out of a contractual relationship) and where it primarily suffered damages as a result.

---

**26.** The only cognizable evidence of record bearing on Uncle Henry's locus of receipt concerns its Chapter 93A allegations. Alleged Chapter 93A acts/practices Nos. 1–19 are identical to alleged fraudulent and negligent misrepresentations Nos. 1–19. *Compare* Plaintiff's Third Interrog. Answers at 10–12 *with id.* at 32–34.

With this preliminary skirmish resolved, I turn to Plaut's multi-pronged attack on the sustainability of the thirty-one alleged misrepresentations. One of Plaut's over-arching points—that the statements are species of non-actionable opinion—is dispositive of most of Uncle Henry's allegations. *See* Defendant's SJ Motion at 10–12. Accordingly, I focus first on it.

■ As the First Circuit has observed, "Claims for fraudulent and negligent misrepresentation, although obviously distinct, both require that the defendant have made a false representation of present fact and that the plaintiff justifiably relied on the representation as true." *Kearney v. J.P. King Auction Co.*, 265 F.3d 27, 33–34 n. 8 (1st Cir.2001) (construing Maine law). Plaut argues, *inter alia,* that none of the alleged misrepresentations constitutes a statement of "present fact" upon which a hearer could justifiably rely, and thus none is actionable as fraud or negligent misrepresentation. Defendant's SJ Motion at 10–12. Specifically, Plaut categorizes Nos. 1–19 as mere promises of future performance, not actionable even if a defendant held a preconceived notion not to perform, and Nos. 7, 9, 14–15 and 20–30 as "sales puffery" or "trade talk" upon which no reasonable person would rely. *Id.* at 10–12, 15. For the most part, I agree.

With respect to the first category—promises of future performance—"[t]raditionally, an action for deceit could be brought under Maine law only if the challenged misrepresentation was of past or existing fact, not just of opinion or of promises for future performance." *Kearney,* 265 F.3d at 34 (citation and internal quotation marks omitted). "Even a preconceived intention not to perform was said to be incapable of turning a breach of a promise ... to do something in the future into an action for deceit." *Id.* (citation and internal quotation marks omitted).

However, as Maine law has evolved, "in appropriate circumstances, promises concerning future performance may be sufficiently akin to averments of fact as to be actionable under Maine misrepresentation law." *Id.* at 35 (citation and internal quotation marks omitted). Specifically, "the relationship of the parties or the opportunity afforded for investigation and the reliance, which one is thereby justified in placing on the statement of the other, may transform into an averment of fact that which under ordinary circumstances would be merely an expression of opinion." *Wildes v. Pens Unlimited Co.,* 389 A.2d 837, 840 (Me.1978) (citation, internal quotation marks and emphasis omitted). As the First Circuit has observed, such circumstances have arisen in cases in which:

1. "[T]he plaintiff is at the mercy of the defendant, such as in employment situations where an employer, with full knowledge of imminent corporate downsizing, nevertheless promises a position to a new salesperson." *Kearney,* 265 F.3d at 35 (citation and internal quotation marks omitted).

2. A defendant has exclusive control over and deliberately conceals critical information relevant to the promised future performance. *Id.* at 35–36.

Of the allegations in issue (Nos. 1–19), Uncle Henry's concedes that the following did indeed pertain to "future events": No. 4 (that EdgeWing would provide services in a professional manner meeting IT industry standards), No. 5 (that EdgeWing would maintain staffing of professionals qualified to provide services at levels sufficient to meet the performance schedules), No. 6 (that EdgeWing staff serving Uncle Henry's would possess the expertise and experience necessary to provide such services), No. 8 (that EdgeWing would migrate the existing web site into a new

architecture), No. 12 (that EdgeWing would take a snapshot of the existing web site and review the code for specifics of existing features and functionality and consultants would review and document the code structure, providing bases for the future site), No. 13 (that work provided under the contract would encompass developing a web site that included all features and functionality of the existing site plus enhancements), No. 16 (that "migrating" the existing site involved taking a "site snapshot" as well as certain review and documentation of the existing site), No. 17 (that Uncle Henry's would have available a test web site), No. 18 (that Uncle Henry's in-house e-mail would be set and handled as part of the hosting agreement) and No. 19 (that the team would be based in Massachusetts). Plaintiff's SJ Opposition at 14; *see also* Schedule of Alleged Misrepresentations. In my view the following also constituted promises of future performance, although not conceded to be so by Uncle Henry's: No. 2 (that EdgeWing could do the job for $593,000), No. 3 (that EdgeWing would achieve "go live" status by January 1, 2001) and No. 7 (that EdgeWing would provide Uncle Henry's a total solution unsurpassed in industry). *See* Schedule of Alleged Misrepresentations.

Uncle Henry's contends that, to the extent the statements in question were promises of future performance, they nonetheless are actionable inasmuch as hey were events within EdgeWing's control. Plaintiff's SJ Opposition at 14. However, the record reveals that (i) the contract in issue arose from a bidding process designed by Uncle Henry's, (ii) the parties—both sophisticated entities represented by experienced counsel—entered into a period of lengthy negotiations, (iii) prior to contract execution, Uncle Henry's counsel and top management undertook detailed investigation of EdgeWing's reputation, experience, work product and personnel, and (iv) the last iteration of the parties' agreement, pored over and approved by Uncle Henry's counsel and executed by Justin Sutton on December 7, 2000, contained clauses disclaiming any express or implied warranties and expressly superseding "all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties pertaining to the subject matter hereof." 12/7/00 Master Agreement/SOW §§ 7.1, 11.11.

Against this backdrop, the parties' relationship cannot fairly be characterized as one that fits an exception to Maine's general rule—*i.e.*, one in which a plaintiff was "at the mercy" of a defendant, a defendant had "exclusive control" over all relevant information or the plaintiff otherwise was vulnerable in such a way as to have reasonably understood promises of future performance to be affirmations of fact.[27]

For these reasons, statements Nos. 2–8, 12–13 and 16–19 are not actionable.

With respect to the second category ("puffing"), the First Circuit has observed that certain general statements made in the course of business dealings "constitute nothing more than 'puffing' or 'trade talk,' upon which no reasonable person would rely." *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58, 65 (1st Cir.1992) (applying Maine law). "Puff" statements are assertions that a plaintiff "could not have justifiably understood ... to be assurances as to specific facts, rather than mere opinion," *Veilleux*

---

27. Nor, as Uncle Henry's essentially admits, does it have direct evidence of deliberate concealment.

*v. National Broad. Co.*, 206 F.3d 92, 121–22 (1st Cir.2000) (applying Maine law), such as the vague and the hyperbolic. *See also, e.g., Kearney*, 265 F.3d at 38 (describing "dealer's talk" as "that picturesque and laudatory style affected by nearly every trader in setting forth the attractive qualities of the goods he offers for sale.... [S]uch is not actionable. The law recognizes the fact that sellers may naturally overstate the value and quality of the articles of property which they have to sell. Everybody knows this, and a buyer has no right to rely upon such statements.") (citation and internal quotation marks omitted).

■ As to this group (statements Nos. 7, 9, 14–15 and 20–30), Uncle Henry's concedes only that part of No. 7 ("unsurpassed in the industry") is puffery and that No. 14 would constitute puffing if it had included a qualitative assessment. Plaintiff's SJ Opposition at 14. I find that the following are indeed "puffery"—vague and/or hyperbolic statements that could not reasonably be understood as assurances as to specific facts and upon which Uncle Henry's could not justifiably have relied as a matter of law: No. 7 (that EdgeWing would provide Uncle Henry's a total solution unsurpassed in industry), No. 9 (that EdgeWing's primary driver was "to do what's right for our client's [sic] businesses"), No. 14 (that EdgeWing was a proven company with a long track record and many years' experience), No. 20 (that EdgeWing provided "fully-integrated, leading-edge eBusiness solutions to middle market companies through full lifecycle approach"), No. 21 (that EdgeWing provided an end-to-end approach ensuring that the same people who develop an understanding of business issues are the people who actually bring your solution to life, true to the objectives outlined from the start), No. 22 (that EdgeWing "understood the realities of ... tight deadlines"), No. 23 (that EdgeWing shared with its clients "a work ethic—the one that says you're not finished until you've satisfied every promise made along the way"), No. 24 (that EdgeWing had "the right combination of people and technology to make it happen for you"), No. 25 (that EdgeWing could help clients "create new efficiencies in b2b [and] b2c," referring to "business to business" and "business to consumer" services), No. 26 (that EdgeWing could "eliminate vendor-to-vendor 'handoffs' (that can often spell delay—or disaster—for your development process) by 'providing one-stop shopping' for all your e-commerce needs"), No. 27 (that EdgeWing provided "a combination of best of breed technological strength, as well as consulting and hosting services that ensure speed, reliability and integrity"), No. 28 (that EdgeWing had more than "40 experienced consultants with process and technical knowledge in developing the appropriate eBusiness solutions for clients") and No. 30 (that EdgeWing employed an approach to website development called its "Think, Run, Enable, Optimize" program). *See* Schedule of Alleged Misrepresentations.

For this reason, Nos. 7, 9, 14, 20–28 and 30 are not actionable.

The foregoing recommended disposition leaves six of the thirty-one alleged statements in play: Nos. 1, 10–11, 15, 29 and 31. Plaut makes a number of additional arguments bearing on this group, one of which is dispositive as to all but No. 1: that Uncle Henry's did not "in fact" rely on these asserted pre-contractual representations. *See* Defendant's SJ Motion at 13.[28] Uncle Henry's adduces no cog-

---

**28.** Plaut argues in the alternative that, given the presence of the parties' integration clause, any reliance by Uncle Henry's was unjustifiable as a matter of law, *see* Defendant's SJ

nizable evidence at all regarding Nos. 10–11 (alleged misrepresentations concerning EdgeWing's quality-assurance program). *See* Schedule of Alleged Misrepresentations; Plaintiff's Additional SMF ¶¶ 1–59; Plaintiff's Opposing SMF. As to Nos. 15 (alleged misrepresentation regarding EdgeWing's ability and experience working with Cold Fusion) and 29 (alleged misrepresentation regarding the use of use cases), Uncle Henry's cognizable evidence touching on those points does not illuminate the issue of its reliance. *See* Schedule of Alleged Misrepresentations; Plaintiff's Additional SMF ¶¶ 4–5. With respect to No. 31 (that "a binding contract was formed in October"), it is clear (as Plaut argues) that Uncle Henry's did not rely on any such representation, or at least not justifiably so. *See* Schedule of Alleged Misrepresentations; Defendant's SJ Motion at 16. Within days after the October signing the parties resumed negotiations, with Uncle Henry's ultimately executing a different version of the Master Agreement and SOW that expressly superseded any prior agreements.

■ Inasmuch as (i) Plaut's motion places Uncle Henry's actual reliance (or lack thereof) in issue, (ii) justifiable reliance is an essential element of the causes of action of both negligent and fraudulent misrepresentation, *see, e.g., Kearney,* 265 F.3d at 33–34 n. 8, and (iii) Uncle Henry's adduces insufficient cognizable evidence to raise a genuine issue of material fact regarding its justifiable reliance on statements Nos. 10–11, 15, 29 and 31, Plaut is entitled to summary judgment as to those claims.

This leaves No. 1—EdgeWing's alleged misrepresentation as to the quality and quantity of progress on the project. Plaut

Motion at 13–14; however, I need not reach

makes two additional arguments bearing on this statement; however, for the following reasons they fall short:

1. That "a mere breach of contract is not actionable as a tort." Defendant's SJ Motion at 9 (citation and internal quotation marks omitted). Plaut does not make clear, nor is it self-evident on the cognizable record, how this alleged misrepresentation (which is distinct from a mere failure to meet deadlines) doubles as a breach of contract.

■ 2. That Uncle Henry's allegations of intentional fraud are completely unfounded inasmuch as (i) Plaut harbored no subjective intent to defraud, (ii) Uncle Henry's has admitted that it has no evidence to support its claims that Plaut intentionally or recklessly misrepresented any facts, (iii) no reasonable juror could find Plaut had an intent to defraud inasmuch as it had no rational motive to do, and (iv) Plaut's "Herculean" effort to satisfy Uncle Henry's demands negates any inference of intent to defraud or bad faith. *Id.* at 12–13. As Uncle Henry's points out, Plaintiff's SJ Opposition at 15–16, this argument misses the mark. Even assuming *arguendo* that Plaut had no subjective intent or motive to defraud and made a Herculean effort to meet Uncle Henry's demands, it still could be found liable for fraudulent misrepresentation to the extent, *inter alia,* that it "made a false representation . . . of a material fact . . . in reckless disregard of whether it [was] true or false[.]" *Mariello v. Giguere,* 667 A.2d 588, 590 (Me.1995). Further, Uncle Henry's adduces evidence of at least one misrepresentation fitting the parameters of statement No. 1: that on or before November 9, 2000 Plaut informed Uncle Henry's of an expected two-week delay although it then anticipated a delay of at

that argument.

least seven weeks. A jury could find this to have been, if not a deliberate lie, a false representation made in reckless disregard of its truth or falsity.

For the foregoing reasons, Plaut demonstrates entitlement to summary judgment as to Counts III and IV with respect to statements Nos. 2–31, but not with respect to statement No. 1.

## C. Count V: Conversion

In Count V of its complaint, Uncle Henry's alleges that EdgeWing refused to return computer equipment belonging to Uncle Henry's upon request, thereby committing the tort of conversion. Complaint ¶¶ 38–39. "[T]he gist of conversion is an invasion of a party's possession or right to possession." *Doughty v. Sullivan*, 661 A.2d 1112, 1122 (Me.1995) (footnote and citation omitted). "The plaintiff must show (1) a property interest in the goods; (2) the right to their possession at the time of the alleged conversion; and (3) when the holder has acquired possession rightfully, a demand by the person entitled to possession and a refusal by the holder to surrender." *Id.* (citation and internal quotation marks omitted).

As Plaut points out, *see* Defendant's SJ Motion at 20, Uncle Henry's claim for conversion implodes for lack of evidence that Plaut refused to surrender the computer equipment in question. Uncle Henry's argues that certain actions by Plaut were tantamount to a refusal—*i.e.,* Plaut's alleged conditioning of the return of the equipment on the signing of a release and alleged threat to tamper with the equipment. *See* Plaintiff's SJ Opposition at 23–24. However, Uncle Henry's fails to adduce cognizable evidence that these events transpired. Hence, Plaut is entitled to summary judgment as to Count V.

## D. Count VI and Eighth Affirmative Defense: Limitation of Liability Clause

In Count VI of its complaint, Uncle Henry's seeks a declaratory judgment that the limitation of liability and damages provisions set forth in the Master Agreement are void and unenforceable with respect to Plaut's alleged unfair or deceptive acts and practices, Complaint ¶¶ 40–41, while in its eighth affirmative defense Plaut asserts the converse—that "Uncle Henry's claims are barred in whole or in part pursuant to the Limitation of Liability provisions set forth in the Master Agreement," Answer/Counterclaims at 16. Plaut seeks summary judgment in its favor as to both Count VI and its eighth affirmative defense, as well as partial summary judgment that, as to counts surviving summary judgment, damages are limited in accordance with the terms of the Master Agreement and SOW. Defendant's SJ Motion at 6–7, 20–21. For the reasons that follow, I find that (i) the version of the contract signed by Justin Sutton on December 7, 2000 represents the final, binding and valid version of the parties' agreement, and (ii) its provisions limiting liability and damages are valid and enforceable as to all causes of action that would survive summary judgment were this recommended decision to be accepted.

As a threshold matter, Uncle Henry's contends that it raises a genuine issue of material fact as to the existence of a written contract between the parties, noting that three versions were signed by one or the other party but not by both: (i) an October 17, 2000 version represented by Picard of EdgeWing as being ready for Uncle Henry's signature, which Justin Sutton did in fact sign and return to EdgeWing with a check in the amount of $202,000 on October 20, 2000, (ii) a version signed by EdgeWing on or about November 3,

2000 but never signed by Uncle Henry's and (iii) the December 7, 2000 version signed by Justin Sutton but evidently not by EdgeWing. Plaintiff's SJ Opposition at 2.

 Plaut argues, and I agree, that there is sufficient evidence that the December 7, 2000 version was the final and binding version of the parties' agreement. *See* Defendant's SJ Reply at 1–3. First, there is no cognizable evidence that the parties had prescribed any particular method of acceptance. "If an offeror prescribes an exclusive method of acceptance, only an acceptance in the manner prescribed will bind the offeror, but if an offeror merely suggests a permitted method of acceptance, other methods of acceptance are not precluded." *Polaroid Corp. v. Rollins Envt'l Servs. (NJ), Inc.*, 416 Mass. 684, 624 N.E.2d 959, 964 (1993). In circumstances in which no exclusive manner of acceptance is prescribed, "[a]lthough silence does not ordinarily manifest assent, the relationship between the parties or other circumstances may justify the assumption that silence indicates assent to the proposal." *Id.; see also, e.g., Samincorp S. Am. Minerals & Merchandise Corp. v. Lewis*, 337 Mass. 298, 149 N.E.2d 385, 388 (1958) (failure to sign and return written contract did not invalidate it given that non-signing party's conduct manifested its acceptance of terms).

Here, the conduct of both Uncle Henry's and Plaut clearly manifested the acceptance by each of the December 7, 2000 version as their final contract. Shortly after the signing of the October 17 version of the contract Plaut reopened negotiations, in which Uncle Henry's willingly and fully engaged. When Plaut's November 3 version was rejected by Uncle Henry's, the parties engaged in further negotiations. On November 30 Picard (on behalf of Plaut) e-mailed Stauffer, stating that he had made necessary changes to the Master Agreement and SOW, which he noted that he was attaching thereto. Picard further stated in his e-mail, "[I]f we are in agreement we can put it to print tomorrow." *See* Defendant's SMF ¶ 30; Plaintiff's Opposing SMF ¶ 30. Plaut thereby fully embraced this version of the contract, which Uncle Henry's counsel, Stauffer, represented to Picard via e-mail was acceptable to Uncle Henry's. Uncle Henry's then cemented its acceptance with Justin Sutton's execution of this version of the operative documents on December 7, 2000. To the extent there could be any doubt, Uncle Henry's has admitted that Justin Sutton understood that the Master Agreement and SOW he signed on December 7, 2000 set forth the agreement between the parties as identified in the document.

Plaut next argues, and I agree, that the operative (December 7) version of the contract clearly limits Uncle Henry's total damages for any and all causes of action to $645,100—comprising the $593,000 payable under the SOW plus an additional $52,100 to which the parties agreed pursuant to a change order. *See* Defendant's SJ Motion at 7; 12/7/00 Master Agreement/SOW § 7.2(a) ("If EDGEWING is liable to the Client, it shall in no event be liable for an amount in excess of the full amounts paid or payable by the Company under the applicable Statement of Work."); 12/7/00 Master Agreement/SOW at 17 (incorporating all provisions from Master Agreement into SOW).

Moreover, as Plaut observes, *see* Defendant's SJ Motion at 7, the contract expressly excludes recovery of damages for "consequential, incidental, special or indirect damages (including loss of profits or business opportunities)," 12/7/00 Master Agreement/SOW § 7.2(a). However, Plaut's argument to the contrary notwithstanding, *see* Defendant's SJ Motion at 7, I

am not persuaded that section 2.2 of the SOW limits Uncle Henry's remedies either to (i) a refund of amounts paid plus relocation costs or (ii) reasonable costs of cover. Rather, the relevant language permits Uncle Henry's to choose either of these options "among other remedies." 12/7/00 Master Agreement/SOW § 2.2.

■ The next and ultimate question is whether these limitation of liability provisions are nonetheless void and unenforceable. Uncle Henry's relies on its Chapter 93A (Count I) and fraud (Count III) claims to vitiate these provisions. *See* Plaintiff's SJ Opposition at 3–5. For the reasons discussed above, the Chapter 93A claim cannot be maintained, and Plaut demonstrates its entitlement to summary judgment with respect to all but one fraud claim. However, the remaining claimed fraud is not fraud in the inducement, which has been held under Massachusetts law to vitiate purported limitation-of-liability clauses, but rather postcontractual fraud.[29] *Compare, e.g. Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551, 558 (1941) ("[C]ontracts or clauses attempting to protect a party against the consequences of his own fraud are against public policy and void where fraud inducing the contract is shown, whether that fraud was 'antecedent' to the contract or 'entered into the making' of it.").

For these reasons, Plaut is entitled to summary judgment as to Count VI and its eighth affirmative defense, as well as partial summary judgment that, as to counts of the amended complaint surviving summary judgment if this recommended decision is accepted, damages are limited in accordance with the terms of the Master Agreement and SOW.

## IV. Conclusion

For the foregoing reasons, I **GRANT** in part and **DENY** in part the plaintiff's motions to strike, **GRANT** the defendant's motion to strike, and recommend that the defendant's summary judgment motion be **GRANTED** with respect to Counts I, V and VI of Uncle Henry's amended complaint and Plaut's eighth affirmative defense, **GRANTED** with respect to Count III and IV as to all claims except for that pertaining to statement No. 1, and otherwise **DENIED**.

I further recommend that the court **DECLARE** and **ADJUDGE**, as to all counts that will survive summary judgment if this recommended decision is accepted, that:

1. Plaut shall in no event be liable to Uncle Henry's except for actual damages;

2. Plaut shall in no event be liable in damages for an amount in excess of the full amounts paid or payable under the SOW (*i.e.*, $645,100) plus reasonable attorney fees up to twenty percent of the amount reflected in the SOW (*i.e.*, $129,020); and

3. Plaut shall in no event be liable to Uncle Henry's for consequential, incidental, special or indirect damages (including loss of profits or business opportunities), damages for loss of or damage to recorded data, or damages suffered by third parties.

If this recommended decision is adopted, the following will remain for trial (in addition to Plaut's counterclaims, as to which no dispositive motion was filed): (i) Count II of the amended complaint and (ii) to the extent they bear on statement No. 1 only, Counts III and IV of the amended complaint.

---

**29.** Uncle Henry's describes statement No. 1 as "not based on failures to perform as promised in the Master Agreement but ... instead a summary of misrepresentations after the Master Agreement was signed." Plaintiff's SJ Opposition at 12.

## NOTICE

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

October 21, 2002.

UNCLE HENRY'S INC., Plaintiff

v.

PLAUT CONSULTING INC., Defendant[1]

### RECOMMENDED DECISION ON DEFENDANT'S MOTION TO AMEND [2]

Defendant Plaut moves to amend paragraph 43 of its answer to include the bases for its assertion that plaintiff Uncle Henry's Inc. ("Uncle Henry's") failed to satisfy conditions precedent to its right to recover. *See generally* Motion. For the reasons that follow, I recommend that the motion be granted.

1. The Complaint names as defendants Plaut Consulting Inc. ("Plaut") and EdgeWing, a division of Plaut. As Plaut points out, technically there is only one defendant inasmuch as EdgeWing was an unincorporated division of Plaut. *See* Defendants' [sic] Motion To Amend Paragraph 43 of Defendant's Answer ("Motion") (Docket No. 45) at 1 n. 1. Therefore, I will follow Plaut's convention of refer-

## I. Applicable Legal Standards

Pursuant to Fed.R.Civ.P. 15(a) a party must seek leave of the court to amend a pleading if either the deadline to amend has expired or the party already has amended its pleading once within the time allotted by the rule. Such leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Leave to amend should be granted in the absence of reasons "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc....." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

## II. Context

The court's electronic docketing entries reflect, in relevant part, that (i) the instant lawsuit was initiated on September 4, 2001 with the filing of Uncle Henry's original complaint, (ii) on October 29, 2001 Uncle Henry's filed an amended complaint, (iii) on November 16, 2001 Plaut filed its answer and counterclaims, (iv) on May 9, 2002 the court approved a final revision to the scheduling order setting a discovery deadline of July 24, 2002 and a motion deadline of August 9, 2002, (v) the instant motion was filed on August 30, 2002, and (vi) this case is on the November trial list.

Both the original and amended complaints contained an identical paragraph 43

ring to itself as "Plaut" or as the "defendant," singular.

2. The pending motion is a dispositive pretrial matter within the meaning of 28 U.S.C. § 636(b)(1)(B), and thus I frame this as a recommended decision. *See Allendale Mut. Ins. Co. v. Rutherford,* 178 F.R.D. 1, 2 & n. 2 (D.Me.1998).

titled "Conditions Precedent," which stated in its entirety: "All conditions precedent to Uncle Henry's right to recover as alleged herein have been performed or have occurred." Complaint ("Original Complaint") (Docket No. 1) ¶ 43; Plaintiff's First Amended Complaint ("Amended Complaint") (Docket No. 10) ¶ 43. In the corresponding section of its answer, likewise titled "Conditions Precedent," Plaut stated simply, "Denied." Answer and Counterclaims ("Answer/Counterclaims") (Docket No. 12) at 15, ¶ 43. However, the answer contained, *inter alia*, the following additional provisions:

### Fourth Affirmative Defense

Plaintiff's claims are barred for failure to satisfy a condition precedent, including but not limited to Plaintiff's failure to satisfy its performance obligations under the agreements.

### Fifth Affirmative Defense

Plaintiff's claims are barred due to Plaintiff's breach of the agreements, as more fully set forth in Plaut's Counterclaims.

\*　　\*　　\*　　\*　　\*　　\*

## COUNTERCLAIMS

\*　　\*　　\*　　\*　　\*　　\*

### COUNT I

### (Breach of Contract)

\*　　\*　　\*　　\*　　\*　　\*

68. Uncle Henry's, by its conduct set forth above, breached its contractual duties to Plaut, including but not limited to the wrongful termination of the Master Agreement and Website Development Statement of Work, the failure to provide a Project Manager, team leads, and core team members to work on the project for its duration, the failure to provide leadership for and coordination of the participation by Uncle Henry's staff as reasonably necessary to timely complete its performance as required by the Website Development Statement of Work, the failure to actively participate in the project and to make available its business community and IT personnel as needed, the failure to provide EdgeWing in a timely fashion all information known or later learned that was necessary for EdgeWing to understand the services to be performed for Uncle Henry's or anything related to the system or EdgeWing's performance of its services, the failure to provide participation from its key resources that supported Uncle Henry's business and who had experience with the specific application being implemented, the failure and refusal to agree upon the requirements and specifications for the website, the failure to define and agree upon Phase I and Phase II of the work in accordance with the agreements amending, modifying, and supplementing the Website Development Statement of Work, and the failure to pay amounts due to Plaut. Answer/Counterclaims 16, 35.

On March 12, 2002 Plaut served its first set of interrogatories on Uncle Henry's. *See* Plaintiff's Response to Defendants' Motion To Amend Paragraph 43 of Defendant's Answer ("Objection") (Docket No. 56) at 1.[3] In Interrogatory No. 12 Plaut asked Uncle Henry's to state the basis for its contention in paragraph 43 of its amended complaint that all conditions precedent to its right to recover had occurred.

---

3. Inasmuch as Plaut does not contest any of Uncle Henry's "procedural background" facts, *see generally* Reply to Plaintiff's Opposition to Defendant's Motion for Leave To Amend Answer Paragraph 43 ("Reply") (Docket No. 63), I accept those set forth herein as true for purposes of this motion.

*Id.* On May 3, 2002 Uncle Henry's responded, in relevant part, that its basis for so asserting was that "FRCP Rule 9 provides that all conditions precedent have been performed or have occurred when such is pled and the opposing party does not specifically and with particularity deny same." *Id.* at 2. Uncle Henry's hewed to this answer in later amended and supplemental discovery responses. *Id.*

### III. Analysis

 In filing the instant motion Plaut seeks belatedly to address, and blunt the force, of Uncle Henry's May 2002 interrogatory stance. *See* Motion at 3. Uncle Henry's counters that Plaut's effort is too little, too late and severely prejudicial, as a result of which it should be rebuffed. *See* Objection at 2–7. The motion indeed could and should have been filed sooner, but under the circumstances, I am not persuaded that Uncle Henry's is prejudiced. Accordingly, I recommend that the proposed amendment be allowed.

"A party's belated attempt to revise its pleadings requires that a court examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations." *Quaker State Oil Refin. Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1517 (1st Cir.1989).

Plaut proffers an amended paragraph 43 cut entirely from the cloth of its November 2001 answer—in fact, remarkably similar to paragraph 68 of its counterclaim. *Compare* Motion at 4–5 *with* Answer/Counterclaims at 35, ¶ 68. This fact in a certain sense cuts against Plaut. With a few strokes of its keyboard, it could have included the same verbiage in its original answer (filed in November 2001) that it seeks to incorporate now. While Plaut may have mistakenly thought in November that the answer as a whole satisfied the letter of Rule 9(c), *see* Motion at 3, that does not account for its further nearly four-month delay in filing the instant motion after Uncle Henry's called the Rule 9(c) issue to its attention on May 3, 2002.[4]

Ultimately, however, the similarity of the proffered amendment to the original answer cuts in Plaut's favor. Late as it is, the proposed paragraph adds nothing surprising. Plaut's November answer made clear the basis for its denial that conditions precedent had been met: that Uncle Henry's had itself allegedly breached the contract in a manner enumerated in Plaut's counterclaims. *See, e.g.,* Answer/Counterclaims at 16, 35 (Fourth and Fifth Affirmative Defenses; Counterclaim ¶ 68). As Uncle Henry's argues, *see* Objection at 5–6, it could not have gleaned from the answer filed in November exactly which of the enumerated breaches allegedly constituted failures to meet conditions precedent.[5] However, there is no "surprise"

---

**4.** Rule 9(c) requires, in relevant part, that, in pleading the performance or occurrence of conditions precedent, a "denial of performance or occurrence shall be made specifically and with particularity." As a result, "provided the complaint includes a general averment that all conditions precedent to suit or recovery have been met, and the defendant does not deny the satisfaction of the preconditions specifically and with particularity, then the plaintiff's allegations are assumed admitted, and the defendant cannot later assert that a condition precedent has not been met." *Walton v. Nalco Chem. Co.,* 272 F.3d 13, 21 (1st Cir.2001) (citation, internal quotation marks and footnote omitted). However, Rule 9(c) does not trump Rule 15(a). To the extent amendment of an answer is proper pursuant to a Rule 15(a) analysis, a defendant is not precluded from asserting a condition-precedent defense. *See, e.g., International Paving Sys., Inc. v. Van–Tulco, Inc.,* 866 F.Supp. 682, 690–91 (E.D.N.Y.1994) (noting propriety of grant of Rule 15(a) request to amend answer to meet requirements of Rule 9(c)).

**5.** Plaut acknowledges that it does not "contend or concede" that every breach alleged in its answer doubles as a failure to meet a condition precedent. Motion at 1 n. 2.

breach among the subset now specified in proposed amended paragraph 43. Inasmuch as appears, the same core facts that underlie Plaut's long-extant breach of contract claims underpin its conditions-precedent defense. Thus, I cannot discern how Uncle Henry's would be "extremely" prejudiced by lack of an opportunity for discovery.

These circumstances distinguish the instant case from *Quaker State,* on which Uncle Henry's heavily relies. *See* Objection at 3–7; *Quaker State,* 884 F.2d at 1518 ("A great deal of discovery had taken place without reference to the neoteric theory [a proposed fifth counterclaim], thus prejudicing QSOR."); *see also, e.g., Carmona v. Toledo,* 215 F.3d 124, 136 (1st Cir.2000) ("Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself to disallow an amendment of a pleading.") (citation and internal quotation marks omitted); 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1487 at 629–32 (2d ed. 1990) ("[P]laintiff will not be sufficiently prejudiced to justify a denial of an application under Rule 15(a) if defendant is allowed to cure an insufficient defense or to amplify a defense that already has been stated in the answer. Thus, courts have allowed amendments when it was established that doing so would not unduly increase discovery or delay the trial, and when the opponent could not claim surprise, but effectively should have recognized that the new matter included in the amendment would be at issue.") (footnotes omitted).

Finally, to the extent Uncle Henry's suggests that even Plaut's proffered amended paragraph 43 is insufficiently detailed to meet the "particularity" requirements of Rule 9(c), *see* Objection at 6, its argument is without merit. Proposed paragraph 43 discloses the specific subset of alleged breaches on which Plaut rests its condition-precedent defense. While Plaut adds the language, "including but not limited to," *see* Motion at 4, Rule 9(c) would preclude the assertion of any further undisclosed alleged failures to satisfy a condition precedent.

## IV. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to amend paragraph 43 of its answer be **GRANTED** and that the defendant be directed to file and serve forthwith an amended answer and counterclaim limited to an amendment of paragraph 43 of the answer, as proposed in its motion.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

October 21, 2002.